DWIGHT F. RITTER, ESQ.  (STATE BAR #127030)
RITTER & ASSOCIATES
2869 INDIA STREET
SAN DIEGO, CA  92103
(619) 296-0123

Attorney for Plaintiffs
ROBERT MATOS and SLOBODAN PRANJIC

**FILED**

DISTRICT COURT OF GUAM

OCT 1 7 2006

MARY L.M. MORAN
CLERK OF COURT

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TCW SPECIAL CREDITS, et al. ) | Case No. 96-00055 |
| Plaintiffs, ) | |
| v. ) | AFFIDAVIT OF DWIGHT RITTER IN SUPPORT OF PLAINTIFFS' MOTION |
| FISHING VESSEL CHLOE Z, ) | TO ESTABLISH PREJUDGMENT INTEREST AND POST-JUDGMENT |
| Et al., ) | INTEREST ON MATOS AND PRANJIC IN REM JUDGMENTS |
| Defendants. ) | |

I, DWIGHT RITTER, attorney of record, on behalf of

plaintiffs ROBERT MATOS and SLOBODAN PRANJIC, affirm as

follows:

1.    I am an attorney admitted to practice in Arizona,

California, Indiana, and conditionally admitted on the Island of

Guam.

///

///

///

1

In re: TCW Special Credits, et al. v. F/V Chloe Z, et al. Case No. 96-00055
Declaration of Dwight Ritter in Support of Motion to Establish Prejudgment
Interest and Post-Judgment Interest
Case 1:96-cv-00055    Document 1577    Filed 10/17/2006    Page 1 of 16
ORIGINAL

2. I have continually represented ROBERT MATOS and SLOBODAN PRANJIC since about 1993, and have first hand personal knowledge as to certain information contained in this affidavit and know that information to be true and correct. As to that information which is based on information and belief and not within my personal knowledge, I believe, in good faith, that information is true and correct.

3. The 9th Circuit Court of Appeals denied the defendant F/V Chloe Z's appeal and affirmed MATOS and PRANJIC'S *in rem* judgments on June 5, 2006. (Ex.1)

4. The 9th Circuit has issued its mandate in September, 2006, and a copy was sent to the Guam District Court.

5. MATOS was originally injured on August 8, 1992 while working as a fisherman on board the F/V Chloe Z. MATOS timely filed his Jones' Act and maritime action in January, 1993, including both *in personam* and *in rem* requests for damages. (Ex.2)

6. PRANJIC was injured on November 25, 1991 while working on board the F/V Chloe Z. PRANJIC timely filed his Jones Act and maritime action in June of 1992, including both *in personam* and *in rem* requests for damages. (Ex.3)

7. In July, 1996, both MATOS and PRANJIC received *in personam* verdicts in their favor, in the amount of $ 1,497,955 and $ 765,000 without interest. These verdicts were reduced to judgments for MATOS on August 13, 1996 and for PRANJIC on July 26, 1996. (Ex.4 & 5)

///

In re: TCW Special Credits, et al. v. F/V Chloe Z, et al. Case No. 96-00055
Declaration of Dwight Ritter in Support of Motion to Establish Prejudgment
Interest and Post-Judgment Interest

8. Defendant F/V Chloe Z appealed each judgment and the 9th Circuit denied their appeals and affirmed the judgments in favor of MATOS and PRANJIC, on November 7, 1999, and on November 6, 1999.

9. In July, 1997, MATOS and PRANJIC received *in rem* verdicts in their favor in the amount of $ 621,515 for MATOS and $ 577,420 for PRANJIC. These findings were reduced to *in rem* judgments for MATOS on February 19, 1999 and for PRANJIC on January 11, 1999.

10. Defendant F/V Chloe Z again appealed the *in rem* judgments and the 9th Circuit issued an order on September 8, 2000 which remanded the *in rem* judgments back to the Guam District Court for an evidentiary hearing related to F/V Chloe Z's assertion that the statue of limitations had expired.

11. On April 8, 2004, Judge Unpingco, on behalf of the District Court, ruled in favor of F/V Chloe Z and disallowed the *in rem* judgments rendered in favor of plaintiff MATOS and PRANJIC.

12. MATOS and PRANJIC then appealed to the 9th Circuit Court of Appeals and, recently on June 5, 2006, the 9th Circuit rendered its decision upholding the *in rem* judgments and mandating that the judgments be satisfied and affirmed with interest in the Guam District Court. (Ex.1)

11. MATOS and PRANJIC, as qualified seamen under general maritime law, are entitled to prejudgment and post-judgment interest.

12. To prove the calculations regarding interest, MATOS and PRANJIC have retained Robert Wallace, CPA, to calculate the

3

In re: TCW Special Credits, et al. v. F/V Chloe Z, et al. Case No. 96-00055
Declaration of Dwight Ritter in Support of Motion to Establish Prejudgment
Interest and Post-Judgment Interest
Case 1:96-cv-00055    Document 1577    Filed 10/17/2006    Page 3 of 16

prejudgment interest for each judgment in this matter.

13.   Mr. Wallace was the duly qualified economist testifying on behalf of each plaintiff in both the *in personam* and *in rem* trials in the Guam District Court.

14.   Mr. Wallace has calculated that MATOS is entitled to prejudgment interest in the amount of $ 235,045.00 and that PRANJIC is entitled to prejudgment interest in the amount of $ 238,129.00 up to and including October 1, 2006. (Ex.8)

15.   In addition, MATOS and PRANJIC are entitled to post-judgment interest pursuant to 28 U.S.C. § 1961.

16.   Robert Wallace has calculated the amount of post-judgment interest from the date of the judgment up to and including October 1, 2006. MATOS is entitled to $ 361,191.00 in post-judgment interest on his *in rem* judgment and PRANJIC is entitled to $ 334,893.00 in post-judgment interest on his *in rem* judgment. (Ex.8)

17.   The Guam District Court has both the authority and responsibility to enter the amended amounts, including accrued interest, and issue a new judgment reflecting the full amount of the monies to which MATOS and PRANJIC are entitled with priority maritime liens and as wards of the court.

18.   The Guam District Court ordered the F/V Chloe Z to be sold and the vessel was sold for approximately $ 6,000,000.

19.   Those funds should be available in the Registry of the Guam Court for the protection of priority maritime lien holders such as MATOS and PRANJIC.

///

///

4

In re: TCW Special Credits, et al. v. F/V Chloe Z, et al. Case No. 96-00055
Declaration of Dwight Ritter in Support of Motion to Establish Prejudgment
Interest and Post-Judgment Interest
Case 1:96-cv-00055   Document 1577   Filed 10/17/2006   Page 4 of 16

20. Plaintiffs are seeking judgment in favor of ROBERT MATOS in the amount of $ 621,515 with accrued prejudgment interest up to and including October 1, 2006 in the amount of $ 235,045 and post-judgment interest accrued in the amount of $ 361,191 up to and including the date of October 1, 2006, for a total of $ 1,217,751. (Ex.8)

21. Plaintiffs are seeking judgment in favor of SLOBODAN PRANJIC in the amount of $ 577,421 with accrued prejudgment interest up to and including October 1, 2006 in the amount of $ 238,129, and post judgment interest accrued in the amount of $ 334,893 up to and including the date of October 1, 2006, for a total of $ 1,150,443. (Ex.8)

22. Attached are exhibits numbered 1-8 which support and verify the information and statements contained in this affidavit.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct, as to personal knowledge and as to knowledge based on information and belief. Executed this $9^{t}$ day of October, 2006, in San Diego, California.

DATED: 10/9/06

LAW OFFICES OF DWIGHT F. RITTER

By: _____
DWIGHT F. RITTER
Attorney for Plaintiffs

In re: TCW Special Credits, et al. v. F/V Chloe Z, et al. Case No. 96-00055
Declaration of Dwight Ritter in Support of Motion to Establish Prejudgment
Interest and Post-Judgment Interest

# Plaintiffs' Exhibit 1

NOT FOR PUBLICATION

**RECEIVED**

JUN 0 8 2006

**HW & B - SEATTLE**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

JUN 05 2006

CATHY A. CATTERSON, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| TCW SPECIAL CREDITS, | No. 04-15948 |
| Plaintiff, | D.C. No. CV-96-00055-JSU |
| v. | |
| FISHING VESSEL CHLOE Z, | MEMORANDUM[*] |
| Defendant - Appellee, | |
| v. | |
| ROBERT MATOS, | |
| Plaintiff-intervenor, | |
| and | |
| SLOBODIAN PRANJIC, | |
| Plaintiff-intervenor - Appellant. | |

Appeal from the United States District Court
for the District of Guam
John S. Unpingco, District Judge, Presiding

Argued and Submitted March 17, 2006

---

[*]     This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir. R. 36-3.

San Francisco, California

Before: NOONAN and HAWKINS, Circuit Judges, and REED,[***] District Judge.

These actions by two injured seamen have already been twice before this court. On the first occasion, we affirmed the *in personam* judgments against the owner of the M/V Chloe Z. It developed that the owner was unable to pay and that its insurer had issued an indemnity policy that would pay only if the owner paid first. The second time before this court we remanded the case for a fact-finding hearing to see if misrepresentations about the insurance had misled the plaintiffs so that their *in rem* claims should not be barred by the three-year statute of limitations. *See* 46 App. U.S.C. § 763a (West 2005); *Usher v. M/V Ocean Wave*, 27 F.3d 370 (9th Cir. 1994) (per curiam). The district court subsequently and correctly found no misrepresentations and no equitable estoppel. The question, however, remains whether the plaintiffs' *in rem* action was barred by the statute of limitations.

The defendant vessel argues, with some plausibility, that implicit in our remand on the issue of equitable estoppel was a holding that, absent such estoppel, the statute of limitations was a bar. As the district court had in the first instance

---

[***] The Honorable Edward C. Reed, Jr., Senior United States District Judge for the District of Nevada, sitting by designation.

2

relied on equitable estoppel, it was natural to send the case back on this issue. Now that the equitable estoppel issue has disappeared, we address, for the first time, whether the *in rem* proceeding was barred by the statute of limitations.

The two plaintiffs filed both their *in personam* actions and their actions *in rem* against the vessel on May 11, 1994. The date was well within the three-year period. The vessel at first did not answer, and a default judgment was entered. But the vessel then appeared in the case and was allowed to respond to the plaintiffs' complaint. It does not lie in the vessel's mouth to assert that the suit was barred when the vessel itself willingly entered the litigation and made no mention of any statute of limitations bar.

Twice, stipulations were signed by counsel on both sides dismissing the vessel. On neither occasion were the stipulations signed or approved by the district court. The stipulations were accordingly without validity. *See* D. Guam Ct. R. GR 3.1 (2006) (formerly codified as D. Guam Ct. R. 126.3 (1996)). The defendant has not challenged this rule.

We did not rule on the timelessness of the *in rem* claims at any earlier stage, although explicitly petitioned by the defendant to do so. The defendant, briefing this case, admitted that the *in rem* claims were alive ("pending") in July 1996, when the *in personam* claims came to trial. They did not merge with the *in*

3

*personam* judgments of that year and remained pending until ruled upon, as they now are.

The plaintiffs' *in rem* judgments against the proceeds of the sale of the vessel are valid. Accordingly, the judgment of the district court is REVERSED, and the case is REMANDED for proceedings in accordance with this disposition.

4

TCW Special Credits, et v F/V Chloe Z 04-15948

REED, District Judge, dissenting:

I respectfully dissent. Only two issues are validly raised on this appeal: (1) whether the district court erred in determining that the Chloe Z was not equitably estopped from asserting the statute of limitations and (2) whether the district court erred in denying the injured seamen's motions to consolidate their *in rem* claims with TCW's mortgage foreclosure against the Chloe Z. Having concluded that neither of these decisions was error, the court nonetheless decides the case in favor of Appellants Matos and Pranjic by finding that the statute of limitations on their *in rem* claims was tolled by their abandoned 1994 *in rem* action against the Chloe Z.

As an initial matter, I agree with Appellee's contention that our 1999 remand on the issue of equitable estoppel implicitly held that, absent such estoppel, the statue of limitations was a bar. Accordingly, our reconsideration of that argument here is inappropriate, particularly given the six years of additional litigation our prior holding spawned.

Looking beyond the prior holding to the merits of the argument, I see no basis for tolling Appellants' claims against the Chloe Z. A claim may be

1

tolled by statute or in equity. *See Nelson v. Int'l Paint Co.*, 716 F.2d 640, 645 (9th Cir. 1983). No statute tolled the Appellants' claims, so any tolling must be equitable. The doctrine of equitable tolling allows the court to toll the running of a statute of limitations "in situations were the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." *Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 96 (1990). In rejecting Appellants' equitable estoppel appeal, the court here accepts the district court's finding that Appellants' failure to pursue their 1994 *in rem* complaint against the Chloe Z was the product of poor judgment, not a defective pleading or any misconduct by the Chloe Z. This is tantamount to a finding that the decision not to try the 1994 *in rem* claims was "garden variety excusable neglect," which precludes equitable tolling. *Id.*

Because voluntary dismissal of a claim eliminates the possibility of tolling, the question of whether Appellants voluntarily dismissed their claims against the Chloe Z has become almost the dispositive issue in this case. The majority acknowledges that the parties twice stipulated to dismissal of the *in rem* claims against the Chloe Z, but finds that the

2

stipulations had no effect because they did not comply with the District of Guam's Local Rule 3-2, which states that "stipulations shall not be effective unless approved by the judge." I cannot agree with this conclusion.

Although it is true that Judge Coughenour, the district court judge who presided over the 1994 lawsuit, did not *sign* the dismissal stipulations, he did *approve* them, which is all that Local Rule 3-2 requires. The record makes it clear that the parties discussed the dismissal of the *in rem* claims against the Chloe Z with Judge Coughenour at the May 1999 pre-trial conference when they discussed the fact that the *in personam* defendant was going bankrupt and would likely not be able to pay any judgment. There is no doubt that Judge Coughenour knew of the stipulated dismissal and the possibility that Appellants would not be able to collect a judgment for their injuries from the *in personam* defendant. The fact that Judge Coughenour allowed the trial to go forward without the participation of Chloe Z evidences his tacit, if not explicit, approval of the dismissal.

In an attempt to shrug off these concerns, the disposition makes two assertions that directly contradict the record. First, the disposition states that "the defendant has not challenged [the District of Guam's Local Rule 3-2]." Contrary to that statement, the Chloe Z argued in its 1999 appeal that Local

3

Rule 3-2 directly contradicts Federal Rule of Civil Procedure 41, which

allows parties to stipulate to dismissal without court order. See, e.g.,

*American States Ins. Co. v. Dastar Corp*, 318 F.3d 881, 888 & n.9 (9th Cir.

2003). If the district court's local rule contradicts the federal rule, the local

rule is void. *See Atchison, Topeka and Santa Fe Ry. Co. v. Hercules Inc*,

146 F.3d 1071, 1074 (9th Cir. 1998). This argument against the finding that

the stipulated dismissals were invalid is not trivial, yet has been dismissed

without analysis in our dispositions of both the current and the 1999 appeals.

It is true that this argument was not raised in the current appeal, but neither

was the issue of whether the plaintiffs' *in rem* claims were barred by the

statute of limitations. Since we are revisiting the statute of limitations

question, fairness dictates that we revisit the Chloe Zs arguments as to why

the stipulated dismissals should be considered effective.

Along the same lines, the disposition claims that the Chloe Z admits

that the stipulations were ineffective. Looking at the record as a whole, I do

not believe it is fair to conclude that the Chloe Z admits that the *in rem*

claims were still pending in 1996. The Chloe Z argued twice that the *in rem*

action was not pending because of the stipulated dismissal in the 1994

lawsuit—once in its motion for reconsideration of the District Courts denial

4

of the Chloe Z's motion to vacate the Plaintiffs' warrant for arrest of the Chloe Z and once in its opposition brief in the 1999 appeal. Having seen this argument rejected by the District Court and ignored by the 1999 panel in its memorandum disposition, it is not surprising that Appellee argued here from the position that the *in rem* claim was still pending in July 1996 in this appeal. Further, it had nothing to lose by going along with the court's ruling, because the equitable estoppel hearing assumed that the statute of limitations would be a bar to the complaint-in-intervention, regardless of whether the *in rem* claim was pending in July 1996. If we had informed the parties that we were revisiting the issue of whether the statute of limitations had passed, I doubt that the Chloe Z would have accepted that the stipulated dismissals were ineffective without argument.

Moreover, regardless of whether the stipulated dismissals were effective, Appellants' failure to produce evidence and argument regarding their *in rem* claims during the 1996 trial on the first complaint acted as a voluntary dismissal of those claims, so it does not matter whether the *in rem* claims were still pending prior to trial. If the *in rem* claims were still pending when the other claims went to trial, Appellants had a duty to present evidence and argue those claims or face both waiver on appeal and claim

5

preclusion in subsequent lawsuits. These doctrines exist, at least in part, to promote timely presentation of evidence and protect against stale claims—the same policies served by statutes of limitation. Accordingly, failure to produce evidence and argument in support of a claim during trial should be treated the same as a voluntary dismissal for purposes of tolling.

6

# Plaintiffs' Exhibit 2

1  WILLIAM O. DOUGHERTY, ESQ.
   State Bar No. 041654
2  DOUGHERTY & HILDRE
   2550 Fifth Avenue, Suite 600
3  San Diego, California 92103.
   Telephone:  (619) 232-9131
4

5  Attorneys for Plaintiff

6

7



FILED
DON HENDRIX, CLERK

JAN 22 1993

U.S. DISTRICT COURT
SOUTHERN DISTRICT
OF CALIFORNIA

8              UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10 ROBERT MATOS,                    )  CASE NO. '930111 B (BTM)
                                    )
11               Plaintiff,         )  COMPLAINT FOR
   v.                               )  DAMAGES FOR PERSONAL
12                                  )  INJURIES
   M/V CHLOE Z, her engines,        )
13 tackle, apparel and furniture,   )
   CHLOE Z FISHING COMPANY, INC.,   )
14 a corporation, TUNA CLIPPER      )
   SERVICES, ZEE ENTERPRISES, INC., )
15 a corporation, and DOES I        )
   through X, inclusive,            )
16                                  )
                                    )
17               Defendants.        )
   _____)

18      COMES NOW plaintiff ROBERT MATOS and for a cause of action

19 against the defendants, and each of them, alleges:

20                  FIRST CAUSE OF ACTION

21      1.   Plaintiff elects to maintain this action under the

22 provision of the Merchant Seaman's Act enacted June 5, 1920, c.

23 250, Section 33, 41 Stat. 1007, otherwise known as the Jones Act,

24 46 U.S.C. Section 688, and also under the General Maritime Law.

25      2.   The true names or capacities, whether individual,

26 corporate, associate, or otherwise of defendants, DOES I through X,

27 inclusive, are unknown to plaintiff who therefore sues said

28 defendants by such fictitious names.  Plaintiff is informed and



PLAINTIFF'S
EXHIBIT
# 1

Case 1:96-cv-00055    Document 1577-2    Filed 10/17/2006    Page 2 of 29

000018

1  believes and thereon alleges that each of the defendants herein

2  designated as a DOE is negligently responsible in some manner for

3  the events and happenings herein referred to, and negligently

4  caused injuries and damages proximately thereby as hereinafter

5  alleged.

6      3.   Plaintiff is informed and believes and thereon alleges

7  that at all times herein mentioned, defendants, and each of them,

8  were individuals, corporations, partnerships and/or unincorporated

9  associations residing and/or doing business in the within District,

10 State of California.

11     4.   Plaintiff is informed and believes and thereon alleges

12 that at all times herein mentioned, defendants, and each of them,

13 were the agent, employee and/or joint venturer of its co-defendant,

14 and as such was acting within the course and scope of said agency,

15 employment and/or joint venture.

16     5.   That at all times herein mentioned, defendant CHLOE Z

17 FISHING COMPANY, INC., TUNA CLIPPER SERVICES, ZEE ENTERPRISES, INC.

18 and DOES I through III, and each of them, were the owners of and

19 operated, managed, maintained, supervised, controlled and inspected

20 the defendant fishing vessel M/V CHLOE Z and used and employed said

21 vessel for the purpose of fishing on navigable waters.

22     6.   That on or about July, 1992, and for some time prior

23 thereto, plaintiff was employed by the defendants, and each of

24 them, aboard the M/V CHLOE Z, was in the employ of the defendants,

25 and each of them, and was acting within the scope, purpose and

26 duties of such service and employment.

27     7.   That on or about mid July, 1992, while said vessel was on

28 or about the high seas, plaintiff was engaged in the performance of

- 2 -

1 | his duties, was in the process of lifting a new and heavy bilge
2 | strainer which was stuck causing plaintiff to injure his back and
3 | right leg, as more specifically hereinafter set forth. Thereafter,
4 | on August 8, 1992, while similarly engaged during the unloading of
5 | the fish, plaintiff reinjured his back and leg when he slipped on
6 | brine solution while attempting to loosen frozen bolts on a broken
7 | brine line.

8 | 8. Disregarding their duties in the premises, defendants,
9 | CHLOE Z FISHING COMPANY, INC., TUNA CLIPPER SERVICES, ZEE
10 | ENTERPRISES, INC. and DOES 1 through X, by their agents, servants
11 | and employees were careless and negligent and the vessel was
12 | unseaworthy in:

13 | (a) Failing to provide a safe place for plaintiff to
14 | perform his duties;

15 | (b) Failing to instruct and/or properly supervise crew
16 | members as to safe means of performing duties;

17 | (c) Failing to provide plaintiff with a safe and
18 | seaworthy vessel;

19 | (d) Failing to provide plaintiff with sufficient and
20 | proper appliances and equipment to perform his work as chief
21 | engineer.

22 | 9. As a direct and proximate result of the negligence and/or
23 | unseaworthiness of the defendants, plaintiff was injured in his
24 | health, state and activity as stated hereinabove.

25 | 10. As a direct and proximate result of the incident alleged
26 | herein, plaintiff was injured in his health, strength and activity,
27 | sustaining severe injury to his body and mind, and shock and injury
28 | to his nervous system and person, all of which injuries have caused

- 3 -

0093

1  and continue to cause great physical and emotional **pain and**
2  suffering. Plaintiff is informed and believes and thereon alleges
3  that some or all of said injuries will result in permanent damage,
4  disability and pain and suffering, causing general damages in an
5  amount to be determined at the time of trial.

6      11. As a direct and proximate result of the incident alleged
7  herein, plaintiff incurred indebtedness for physicians,
8  hospitalization, x-rays, drugs and sundries in the treatment of
9  said injuries and will be so indebted in the future. Plaintiff
10 will respectfully submit said amounts, upon proof, at the time of
11 trial.

12     12. As a direct and proximate result of the incident alleged
13 herein, plaintiff was prevented from attending to his usual
14 occupation and is informed and believes and thereon alleges that he
15 will continue to be so prevented from attending to his usual
16 occupation, resulting in a loss of earnings to the plaintiff in an
17 amount which is not known at the present time, but which will be
18 respectfully submitted, upon proof, at the time of trial.

19     WHEREFORE, plaintiff prays judgment against the defendants,
20 and each of them, as follows:

21     1. For general damages in an amount to be determined at the
22 time of trial;

23     2. For medical and incidental expenses, both present and
24 future, according to proof;

25     3. For lost earnings, both present and future, according to
26 proof;

27     4. For prejudgment interest at 10% per annum;

28     5. For costs of suit incurred;

- 4 -

0094

000021

1      6.  For such other and further relief as the Court may deem

2 just and proper.

3                        DOUGHERTY & HILDRE

4 Dated: 1/21/93

5                     By: _____

6                       WILLIAM O. DOUGHERTY
                         Attorney for Plaintiff

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

– 5 –

0095

# Plaintiffs' Exhibit 3

1  WILLIAM O. DOUGHERTY, ESQ.
   State Bar No. 041654
2  DOUGHERTY & HILDRE
   2550 Fifth Avenue, Suite 600
3  San Diego, California 92103
   Telephone: (619) 232-9131
4
5  Attorneys for Plaintiff
6
7
8              UNITED STATES DISTRICT COURT
9             SOUTHERN DISTRICT OF CALIFORNIA
10 SLOBODAN PRANJIC,                    )  CASE NO. '92-844 GT (P)
                                        )
11                        Plaintiff,    )  COMPLAINT FOR DAMAGES
   v.                                   )  FOR PERSONAL INJURIES
12                                      )
   M/V CHLOE Z, her engines,            )
13 tackle, apparel and furniture,       )
   CHLOE Z FISHING COMPANY, INC.,       )
14 a corporation and DOES 1 through     )
   X, inclusive,                        )
15                                      )
                                        )
16                        Defendants.   )
   ─────────────────────────────────────)
17
       COMES NOW plaintiff SLOBODAN PRANJIC and for a cause of
18 action against the defendants, and each of them, alleges:
19                    FIRST CAUSE OF ACTION
20     1.   Plaintiff elects to maintain this action under the
21 provision of the Merchant Seaman's Act enacted June 5, 1920, c.
22 250, Section 33, 41 Stat. 1007, otherwise known as the Jones Act,
23 46 U.S.C. Section 688, and also under the General Maritime Law.
24     2.   The true names or capacities, whether individual,
25 corporate, associate, or otherwise of defendants, DOES I through X,
26 inclusive, are unknown to plaintiff who therefore sues said
27 defendants by such fictitious names. Plaintiff is informed and
28 believes and thereon alleges that each of the defendants herein



FILED ___ LODGED
RECEIVED ___ ENTERED

JUN -5 1992

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

PLAINTIFF'S
EXHIBIT
# 3

1  designated as a DOE is negligently responsible in some manner for
2  the events and happenings herein referred to, and negligently
3  caused injuries and damages proximately thereby as hereinafter
4  alleged.

5      3.  Plaintiff is informed and believes and thereon alleges
6  that at all times herein mentioned, defendants, and each of them,
7  were individuals, corporations, partnerships and/or unincorporated
8  associations residing and/or doing business in the within District,
9  State of California.

10     4.  Plaintiff is informed and believes and thereon alleges
11  that at all times herein mentioned, defendants, and each of them,
12  were the agent, employee and/or joint venturer of its co-defendant,
13  and as such was acting within the course and scope of said agency,
14  employment and/or joint venture.

15     5.  That at all times herein mentioned, defendant CHLOE Z
16  FISHING COMPANY, INC. and DOES I through III, and each of them,
17  were the owners of and operated, managed, maintained, supervised,
18  controlled and inspected the defendant fishing vessel M/V CHLOE Z
19  and used and employed said vessel for the purpose of fishing on
20  navigable waters.

21     6.  That on or about November 25, 1991, and for some time
22  prior thereto, plaintiff was employed by the defendants, and each
23  of them, aboard the M/V CHLOE Z, was in the employ of the
24  defendants, and each of them, and was acting within the scope,
25  purpose and duties of such service and employment.

26     7.  That on or about November 25, 1991, while said vessel was
27  on or about the high seas, plaintiff was engaged in the performance
28  of his duties, was in the process of going from the M/V CHLOE Z to

- 2 -

another boat tied up next to it when plaintiff was caused to fall
between the boats striking his left ankle in the process, as a
result of which he sustained injuries to his left ankle which are
more specifically hereinafter set forth.

8. Disregarding their duties in the premises, defendants,
CHLOE Z FISHING COMPANY, INC. and DOES 1 through X, by their
agents, servants and employees were careless and negligent and the
vessel was unseaworthy in:

    (a) Failing to provide a safe place for plaintiff to
perform his duties;

    (b) Failing to provide plaintiff with safe egress and
ingress;

    (c) Failing to instruct and/or properly supervise crew
members as to safe means of egress and ingress;

    (d) Failing to provide plaintiff with a safe and
seaworthy vessel.

9. As a direct and proximate result of the negligence and/or
unseaworthiness of the defendants, plaintiff fell as stated
hereinabove and was injured in his health, state and activity.

10. As a direct and proximate result of the incident alleged
herein, plaintiff was injured in his health, strength and activity,
sustaining severe injury to his body and mind, and shock and injury
to his nervous system and person, all of which injuries have caused
and continue to cause great physical and emotional pain and
suffering. Plaintiff is informed and believes and thereon alleges
that some or all of said injuries will result in permanent damage,
disability and pain and suffering, causing general damages in an
amount to be determined at the time of trial.

- 3 -

0090

11. As a direct and proximate result of the incident alleged herein, plaintiff incurred indebtedness for physicians, hospitalization, x-rays, drugs and sundries in the treatment of said injuries and will be so indebted in the future. Plaintiff will respectfully submit said amounts, upon proof, at the time of trial.

12. As a direct and proximate result of the incident alleged herein, plaintiff was prevented from attending to his usual occupation and is informed and believes and thereon alleges that he will continue to be so prevented from attending to his usual occupation, resulting in a loss of earnings to the plaintiff in an amount which is not known at the present time, but which will be respectfully submitted, upon proof, at the time of trial.

WHEREFORE, plaintiff prays judgment against the defendants, and each of them, as follows:

1. For general damages in an amount to be determined at the time of trial;

2. For medical and incidental expenses, both present and future, according to proof;

3. For lost earnings, both present and future, according to proof;

4. For prejudgment interest at 10% per annum;

5. For costs of suit incurred;

6. For such other and further relief as the Court may deem

/////

/////

/////

- 4 -

0091

1 │ just and proper.

2

3 │ Dated: 6/2/92

DOUGHERTY & HILDRE

By: _____
     WILLIAM O. DOUGHERTY
     Attorney for Plaintiff

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 5 -

0092

# Plaintiffs' Exhibit 4

RECEIVED
CARLSMITH BALL WICHMAN
CASE & ICHIKI
Date: 8/20/96
Time: 11:58   By: RW

F I L E D
DISTRICT COURT OF GUAM

AUG 19 1996

MARY L. M. MORAN
CLERK OF COURT

DISTRICT COURT OF GUAM

TERRITORY OF GUAM

| | |
|---|---|
| ROBERT MATOS, | ) CIVIL ACTION 94-00013 |
| Plaintiff, | ) |
| vs. | ) J U D G M E N T |
| CHLOE Z FISHING COMPANY, INC., ET AL., | ) |
| Defendants. | ) |

This action came before the Court July 23 through July 26, 1996, for trial before a Jury. The Jury rendered its verdict on July 26, 1996. The Court now incorporates that verdict into the following final judgment.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1. Judgment is entered in favor of plaintiff Robert Matos ("Matos") and against Chloe Z Fishing Company, Inc., for the sum of One Million Four Hundred Ninety Seven Thousand Nine Hundred Fifty Five and No/100 ($1,497,955.00) Dollars.

CALENDARED
ATTN: CALVO HBL
BY : DD
DATE: 9/2/96  9/18/9

132

2. Interest shall accrue on the amount set forth in paragraph 1 from the date this judgment is entered, at the rate of _5.81_ ___ per cent, in accordance with 28 U.S.C. 1961.

3. Matos is also awarded his costs which shall be determined in accordance with 28 U.S.C. 1920. This judgment shall be deemed to include those costs allowed by this Court or the Clerk of Court.

Executed on ~~July~~ August 13 , 1996

JOHN C. COUGHENOUR
District Judge

Presented By:

Dwight F. Ritter
Law Offices of Dwight F. Ritter
170 Laurel Street
San Diego, California  92101

By:  Dwight F. Ritter
for

I hereby certify, that the annexed instrument is a true copy of the original on file in my office.
ATTEST: CLERK OF COURT
District Court of Guam
Territory of Guam

By: _____ Clerk

2

ED 7-19-96
P

RECEIVED

JUL 2 9 1996

DISTRICT COURT OF GUAM

133

# Plaintiffs' Exhibit 5

DISTRICT COURT OF GUAM

TERRITORY OF GUAM

| | | |
|---|---|---|
| SLOBODAN PRANJIC, | ) | CIVIL ACTION 94-00014 |
| Plaintiff, | ) | |
| vs. | ) | J U D G M E N T |
| CHLOE Z FISHING COMPANY, INC., ET AL., | ) | |
| Defendants. | ) | |

This action came before the Court July 15 through July 19, 1996, for trial before a Jury. The Jury rendered its verdict on July 19, 1996. The Court now incorporates that verdict into the following final judgment.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1. Judgment is entered in favor of plaintiff Slobodan Pranjic ("Pranjic") and against Chloe Z Fishing Company, Inc., for the sum of Seven Hundred Sixty Five Thousand and No/100 ($765,000.00) Dollars.

R E C E I V E D
CAP . . . . . . CHMAN
Date: 7/29/96
Time: 4:40    by: ___

123

2. Interest shall accrue on the amount set forth in paragraph 1 from the date this judgment is entered, at the rate of __5.59__ ___ per cent, in accordance with 28 U.S.C. 1961.

3. Pranjic is also awarded his costs which shall be determined in accordance with 28 U.S.C. 1920. This judgment shall be deemed to include those costs allowed by this Court or the Clerk of Court.

Executed on July _7_ , 1996

_____
JOHN C. COUGHENOUR
District Judge

EOD 7/26/96

Presented By:

Dwight F. Ritter
Law Offices of Dwight F. Ritter
170 Laurel Street
San Diego, California  92101


_____
By:  Dwight F. Ritter

2

124

# Plaintiffs' Exhibit 6

1
2
3
4
5               DISTRICT COURT OF GUAM
6                  TERRITORY OF GUAM
7

FILED
DISTRICT COURT OF GUAM

FEB 1 9 1999

MARY L.M. MORAN
CLERK OF COURT

8   TCW SPECIAL CREDITS, et al.,
9            Plaintiffs,                    Civil Case No. 96-00055
10                vs.
11  F/V CHLOE Z, et al.,
12           Defendants,
13
                                           RECEIVED
14  ROBERT MATOS,                       ARRIOLA, COWAN & ARRIOLA
15       Plaintiff in Intervention,
                                           FEB 22 1999
16                vs.
17  F/V CHLOE Z, et al.,                BY_____ TIME: 12:05
18           Defendants.
                                              ORDER

19          This case came on for trial on July 20, 1998. At the conclusion of the trial, the Court
20   took the matter under advisement, and thereafter reviewed the trial testimony which was
21   submitted by way of videotape deposition or transcript deposition. The Findings of Fact and
22   Conclusions of Law follow.
23   **Findings of Fact:**
24          Robert Matos, a 39 year old Portuguese American who settled in San Diego, began
25   fishing after high school and aspired to be an ship's engineer. He eventually earned a U.S. Coast
26   Guard Chief Engineer's license but worked as an assistant engineer on board the Chloe Z tuna
27
28                                            1

1 │ purse seiner, a ship belonging to the Zuanich fleet and fishing in the Western Pacific.

2 │      On Trip #11 with the Chloe Z, a situation arose on August 8, 1992, in which Matos, as

3 │ assistant Engineer of the vessel, had to lift a strainer as a part of his regular duties. The strainer

4 │ was a two foot by six inch strainer which weighed 44 pounds. Matos was asked to give a

5 │ helping hand to crewmembers Kolega and Vidov who were trying to lift it for routine cleaning.

6 │      As he entered the strainer room, he observed two individuals (non-engineers) trying to

7 │ lift the strainer. Matos testified that since he understood straining equipment, he thought he

8 │ could lift it himself better than the untrained crew who were trying to lift it at that time. In his

9 │ career he had lifted many strainers. Matos positioned himself to lift the strainer and lifted. He

10 │ testified that he was in a squat position as he started to lift. He could not lift it, in fact, he

11 │ severely strained his back in the process and had to immediately retire to his berth to rest.

12 │ Others then lifted the strainer using a crow-bar type instrument for leverage — it lifted easily.

13 │ Following his injury, Matos reported his injury to Chief Engineer Moraro and was taking

14 │ painkillers. His duties had to be lightened because of his injury.

15 │      Though expert career engineer Copitas testified that the strainer was made of materials

16 │ fit for its intended duties, evidence is strong to the contrary. The strainer collects debris sucked

17 │ up from the pipe alley and the engine room. However, Expert Patterson testified that the

18 │ strainer was composed of mild steel. Mild steel is a ferrous metal which was inappropriate for

19 │ use on a vessel at work in the high seas for months at time because ferrous metals corrode faster

20 │ than non-ferrous metals. A strainer is a piece of equipment which must be cleaned frequently at

21 │ sea. Because of this the strainer must be made of materials which are easy to clean. The

22 │ previous strainer in this vessel was made of non-corrosive metals. The constant exposure to

23 │ seawater contributed to the rusting of these materials and the corrosion caused the flange to

24 │ freeze inside the cannister. Career Engineer Copitas testified that lighter strainers were available.

25 │      The strainer which Matos lifted was custom made and installed at Casamar Shipyards on

26 │ Guam. This larger strainer was installed, replacing the prior, smaller, one, which had

27 │

28 │                            2

deteriorated. However, an identical strainer could have been installed but was not. There was testimony that this was because the prior strainer could not quickly clean the bilge as fast as the new one, and in an effort to increase the efficiency of the ship, the larger strainer was ordered. This is consistent with Moraro's testimony that the lighter strainer clogged more easily. The strainer is a very important piece of safety equipment on board, because the strainer must be able to be lifted very quickly if the ship is ever in a position that it is taking on water. As was stated at trial, if it takes a lot of time to lift the strainer, the ship may have already taken on enough water to sink, thus the importance of a liftable strainer. Matos testified that he had once lifted the prior strainer with one finger. In the 17 years that Matos had fished he had never seen a strainer like this, and had no reason to expect it to be any heavier than the lighter strainers he had worked with on other boats. There was also evidence that all other strainers on board were of the lighter variety that Matos was familiar with, in fact the predecessor to the strainer in question was reportedly the size of a coffee can.

A second incident took place on Trip #12 which exacerbated Matos' injury. The ship was docked in Tinian and the fish in the hold were frozen together. There was testimony that the fish were stuck because of improper freezing and packing of the fish, which is the responsibility of the Chief Engineer. The decision was made by the Chief Engineer to use seal bombs to dislodge the fish. When the seal bomb explosion went off it resulted in a pipe in the pipe alley bursting. Matos was asleep at this time, as it was 6 a.m. and he had been on watch all the previous night. When the pipe burst he was awakened by then Chief Engineer Leinert and asked to come attend to the emergency. In order to stop the pipe leak, he needed to loosen a bolt on the pipe flange. Chief Engineer Moraro instructed Matos to do so to stop the flooding.

Removal of bolts is a standard part of an engineer's duties on board his assigned vessel. The bolt that Matos had to loosen was made of mild steel galvanized rather than stainless steel. Matos could not tell from looking at the bolt that it was frozen. Once he tested it he realized it was frozen so he decided to loosen it with a "cheater bar" and a wrench on the bolt. He had to

3

1   again position himself to put sufficient pressure on that bolt. The flooring was wet because of
2   the flooding. He was wearing his engineer boots. He tested his footing and thought his footing
3   was adequate to prevent injury. He then had to step off the cat walk. He pulled on the bolt hard
4   only once, but hard enough that he fell against the wrench which made him slip and fall
5   backwards. His foot immediately went numb and he felt intense pain. He had again injured his
6   back.

7        To eventually remove the bolts, they were cut off by torch by Leinert, though there was
8   testimony that the ship's captain ordered the torching to stop because it was creating toxic
9   fumes.

10       Often, an oxygen acetylene torch is used to remove a stuck bolt. However, the risk of
11  toxic fumes from the burning of PVC plastic prevented this from being a safe alternative. There
12  was also testimony that "penetrating oil" is also sometimes used but that it takes several hours to
13  work on a stuck bolt. Because of the rushing water, Matos did not have time to use penetrating
14  oil to loosen the bolt.

15       Immediately after the injury, he was assisted to Chief Engineer's quarters and given
16  codeine painkillers and was outfitted with a back brace. As the ship was on its way to Guam,
17  Matos did not ask for any special transportation to Guam.

18       The Chloe Z docked on Guam two days later, and Matos was taken immediately to
19  Guam Memorial Hospital. He was x-rayed and given medication for muscle spasms. He was
20  not admitted to the hospital but returned to the boat to convalesce. Moraro recommended back
21  massages and a chiropractor, which did not improve Matos' pain. The vessel left again for a
22  fishing trip, but Matos' leg remained numb, and this restricted his capacity to perform his duties
23  on the trip. He was unable to ascend or descend stairs. His numbness increased and his bowels
24  quit working, so he asked the captain to drop him in the next port, which was Kosrae in the
25  Federated States of Micronesia. He immediately went to the doctor in Kosrae, who told him
26  that he needed treatment in the mainland. He proceeded immediately to Los Angeles. Upon

27

28                                                    4

1 arrival in California he was examined by a doctor and told that he had two herniated discs and
2 needed surgery. He underwent the recommended surgery and the ensuing physical therapy.

3       He is still undergoing physical therapy. He still experiences numbness and pain in his
4 arms and legs. He cannot sit or stand for too long. He also suffered depression from the loss of
5 his ability to work on a fishing trip and from the loss of a more physical lifestyle (surfing and
6 skiing). He is also still being medicated. Because he could not work in the fishing industry any
7 longer, he attended card dealer school in his home town of Las Vegas. He works now as a
8 dealer in a casino, presently earning $32,000.00 per year. His lifestyle has suffered because he
9 has not been able to make the average of $75,000 to $80,000 per year he was making in the tuna
10 industry. The only restriction from his back injury on Matos' new career as a casino worker is
11 that he cannot work the craps table because of the bending required.

12 ///
13 ///
14 ///
15 ///
16 ///
17 ///
18 ///
19 ///
20 ///
21 ///
22 ///
23 ///
24 ///
25 ///
26 ///
27 ///
28 ///

5

**Conclusions of Law:**

1  

2   The Court finds that the plaintiff has established a lien against the vessel Chloe Z

3 pursuant to the general maritime laws of the United States and pursuant to Supplemental Rules

4 for Certain Admiralty and Maritime Claims C & E, and Rule 9(h) of the Federal Rules of Civil

5 Procedure and for a preferred maritime lien under 46 U.S.C. §31302(j)(6).

6   As to the unseaworthiness cause of action, the plaintiff has the burden of proving the

7 following by a preponderance of the evidence: (1) the Chloe Z was unseaworthy, and (2) the

8 unseaworthy condition was a proximate cause of an injury to the plaintiff. As to the definition of

9 unseaworthiness: A vessel owner has a duty to provide and maintain a seaworthy vessel. A

10 vessel is seaworthy if the vessel and all of its parts and equipment are reasonable for their

11 intended purpose, and it is operated by a crew reasonably adequate and competent for the work

12 assigned. A vessel is unseaworthy if the vessel, or any of its parts or equipment, is not

13 reasonably fit for its intended purpose or if its crew is not reasonably adequate or competent to

14 perform the work assigned. Unseaworthiness is a proximate cause of injury or damage if it

15 played a substantial part in bringing about injury or damage.

16   If supported by the facts, the principles of contributory negligence would apply to this

17 case. Title 45 U.S.C. §53 provides that if the plaintiff was contributorily negligent, any award

18 may be reduced by the percentage of plaintiff's negligence. If the defendant raises the

19 affirmative defense of plaintiff's negligence, the defendant has the burden of proving each of the

20 following by a preponderance of the evidence: (1) the plaintiff was negligent, and (1) the

21 plaintiff's negligence was a proximate cause of the plaintiff's own injury.

22   The issue is whether the ship was in an unseaworthy condition as configured with the

23 strainer outfitted by Casamar, and further whether the use of the mild steel bolts presented a

24 further unseaworthy condition.

25   Though lifting a strainer may have been a routine task for an assistant engineer, this does

26 not relieve the vessel owner of providing a seaworthy vessel, which includes making sure that

27  

28           6

1   the equipment on the ship was fit for its intended purpose. The Chief Engineer (Moraro) had
2   the legal duty to ensure that safe equipment is used for the purposes of the tuna vessel. The
3   Court finds that the strainer was too heavy for its intended purpose and that the use of mild steel
4   bolts in the pipe alley, where sticky bolts can create emergencies, was also unsuitable.

5       The doctrine of unseaworthiness requires that the vessel, including the hull, the decks, or
6   the machinery, be reasonably fit for the purpose for which they are used. Gutierrez v.
7   Waterman S.S. Corp., 373 U.S. 206 (1963). The vessel components were not reasonably fit for
8   their intended purpose. There was indication that there were stainless steel bolts on board that
9   could have been traded out for the mild steel bolts but were not. After Matos' injury however,
10   Chief Engineer Leinert removed all mild steel bolts and replaced them by stainless steel bolts.

11       Defendant's expert engineer Copitas testified that there was no unseaworthy condition
12   on board the Chloe Z, but he has never even been on board the Chloe Z and has never seen the
13   strainer or the pipe alley in which Matos injured himself. He did testify that the Chief Engineer
14   of a vessel makes the decision to approve what type of strainer to install on the vessel. He
15   decides where it goes and what size it is. However, even Chief Engineer Moraro testified that
16   the configuration of the strainer was defective and inappropriate.

17       Though Matos held a Coast Guard Chief Engineer's license, there was a practice on the
18   Zuanich tuna boats to place Croatians in the higher positions and to put the Coast Guard
19   licensees on board as paper officers such as "paper captains" etc. Though Copitas testified that
20   Matos was the nominal "chief engineer" the Court finds this completely incredible because
21   Moraro was receiving $27.50 per ton of tuna and Matos was receiving $14.50 per ton of tuna.
22   Even Copitas stated that Matos took his orders from the Chief Engineer. For this reason,
23   though Matos held a Chief Engineer's license, the Court will not hold him to the standard of a
24   chief engineer because he did not get paid as a chief engineer. All experts and percipient
25   witnesses have confirmed that Matos was subject to the authority of Chief Engineer Moraro and
26   had to follow his orders.

27

28             7

1      Copitas also testified that seal bombs should never be used on any tuna boat. No Chief

2 Engineer should allow seal bombs to be present on the vessel. There are much safer alternatives

3 to unsticking fish than the use of seal bombs. It is the Chief Engineer's responsibility to make

4 sure the fish are not packed too tightly, and that the salinity is correct. When fish are too tightly

5 packed and freeze together it is the direct responsibility of the engineer, and the safest way to

6 relieve it is to drain the hold and re-pump the water in the hold, and drain and re-freeze, etc.,

7 until the fish loosen. However, there was testimony that this was not done because they were

8 not allowed to pump brine into Tinian harbor by law. Seal bombs were chosen as the fastest

9 alternative, but there was testimony that the Chief Engineer should have prevented the frozen

10 tuna in the first place.

11      As to contributory negligence, the Court does not accept Expert Copitas' opinion that

12 Matos' injuries were 100% his fault. The strainer was too large and heavy and made of the

13 wrong materials, and the bolts were made of the wrong materials. However, as a holder of a

14 Chief Engineer's license, the Court holds him to a higher standard, as he is in a position to make

15 discretionary decisions in his position that a mere crewmember would not have the discretion to

16 make. Matos was told to lift the strainer, and he was told to loosen the bolt. He was not told

17 how to do so (as opposed to a non-specialized crewmember being told how to cross between

18 boats — albeit tacitly, or being told specifically how to cross over blowers). Because he

19 exercised his own decision-making powers in deciding how to do something, the Court is

20 compelled to assign some of the duty of care to him. The Court finds that Matos was 33%

21 negligent in his injuries. Pursuant to the principles of contributory negligence, his award will be

22 reduced by this amount.

23      The Court declines to find more negligence on Matos' part because there is no question

24 that he was injured in performing his duties. He would not have been injured but for the

25 unseaworthy equipment on the boat. When a young man's injuries result from service to his

26 employer and that young man's career aspirations are ruined by that injury, the ship that

27

28                     8

1  benefitted from the hard work cannot avoid responsibility for the resulting loss. The service
2  rendered by Matos were meant to benefit the Chloe Z to the severe detriment of Matos, despite
3  the fact that he approached the task at hand with perhaps an injudicious manner.
4          The Court finds that Matos is entitled to:
5  1. Medical and incidental expenses as prayed for in the complaint;
6  2. Lost present and future earnings in an amount to be calculated thus: In one of Matos' most
7  successful years, he fished 7 months per year. Expert Wallace figured, as shown on Exhibit 68
8  of the joint trial exhibits, that Matos would take off only one month per year, therefore Wallace
9  presumes that Matos will fish for 11 months per year. It is not credible that he would have
10 fished for 11 months per year for 22.85 years. The Court splits the difference and will grant
11 damages in the amount to be calculated at fishing nine months of the year, up to age 61. The
12 Court also accepts the scenario that Matos would have been a Chief Engineer later in his career.
13 The Court accepts the figure presented by Expert Wallace of $1,126,025, representing the
14 summary of economic loss, offset by wages and benefits received, working as an Assistant
15 Engineer until approximately age 40, and thereafter as a Chief Engineer, using the average
16 tonnage of the tuna fleet of the Western Pacific. Plaintiffs presented insufficient evidence to
17 compel the Court to the conclusion that Matos would have stayed within the top 50% of the
18 tuna fleets of the Western Pacific.

19         Expert Wallace's opinions did not present an alternative for lost wages for working only
20 nine months per year rather than eleven months per year. The lost wages as presented in
21 Wallace's deposition is not broken down by month. The Court has no choice, therefore, but to
22 simply reduce the loss of wages and benefits by 16.66%, which represents the difference
23 between 11/12 (eleven of twelve months) and 9/12 (nine of twelve months), resulting in the
24 following calculations:

25 Past period (net of taxes):                        $333,369 less 16.66% = $277,829.73
        Loss of wages and taxes
26 Less: Offset Wages and Benefits:                   $67,771
   SUBTOTAL: Past period:                            $210,058.73
27

28                                    9

0181

Future period (in present value dollars and net of taxes):     $1,457,696 - 16.66%
                                                               =$1,214,842.85

Less: Offset Wages and Benefits:                               $597,269
SUBTOTAL:                                                      $617,574.85

TOTAL ECONOMIC LOSS:                                           $827,633.58

The Court accepts the 4% discount as provided for by economist Wallace. Because Matos is a U.S. Citizen, the Court also accepts that the U.S. tax rates should apply. The contributory negligence factor of 33% is applied to this figure, resulting in a final lost present and future earnings award of $554,514.50.

3. Past pain and suffering of $50,000 (less 33%);

4. Future pain and suffering of $50,000.00 (not discounted to present day value pursuant to United States v. Hiyashi, 282 F.2d 599, 606 (9th Cir. 1960)), (less 33%).

Plaintiff has not shown any support in law for his prayer for pre-judgment interest.

Each party is to bear his own costs. The Clerk of Court is to prepare a judgment in accordance with this.

SO ORDERED this 19 day of February, 1999.

JOHN S. UNPINGCO
District Judge

10

0182

FILED
DISTRICT COURT OF GUAM

FEB 22 1999

MARY L.M. MORAN
CLERK OF COURT

DISTRICT COURT OF GUAM

TERRITORY OF GUAM

| | |
|---|---|
| TCW SPECIAL CREDITS, et al., ) | CIVIL CASE NO. 96-00055 |
| Plaintiff, ) | |
| vs. ) | **PARTIAL JUDGMENT** |
| F/V CHLOE Z, et al., ) | |
| Defendants ) | |
| ROBERT MATOS, ) | |
| Plaintiff-in-Intervention ) | **RECEIVED** |
| vs. ) | ARRIOLA, COWAN & ARRIOLA |
| M/V CHLOE Z, et al., ) | FEB 22 1999 |
| Defendants ) | BY: ___ TIME: 12:05 |

D. Paul Vernier
McKEOWN VERNIE PRICE MAHER
Suite 808, GCIC Bldg.
414 West Soledad Avenue
Agana, Guam 96910

Craig Miller
Davis Wright Tremaine LLP
2600 Century Square
1501 Fourth Avenue
Seattle, WA 98101

Dwight F. Ritter
LAW OFFICE OF DWIGHT F. RITTER
170 Laurel Street
San Diego, CA 92101

George Butler, Esq
BUTLER & TELFORD BUTLER
137 Murray Blvd., Suite 203
Hagåtña, Guam 96910

LAW OFFICES OF CESAR CABOT, P.C.
Cesar A. Cabot
First Savings & Loan Bldg.
655 S. Marine Drive
Tamuning, Guam 96911

William L. Banning
Kurt Micklow
BOOTH BANNING LLP
402 West Broadway, Suite 50
San Diego, CA 92101

| 1 | G. Patrick Civille | Steven Zamsky |
|---|---|---|
| | CHING BOERTZEL CIVILLE CALVO & TANG | ZAMSKY LAW FIRM |
| 2 | Suite 400, GCIC Bldg. | Suite 501, Bank of Guam Bldg. |
| | 414 West Soledad Avenue | 111 Chalan Santo Papa |
| 3 | Agana, Guam 96910 | Agana, Guam 96910 |
| 4 | Anita P. Arriola | Michael A. Barcott |
| | ARRIOLA COWAN & ARRIOLA | HOLMES WEDDLE & BARCOTT |
| 5 | P.O. Box X | 999 Third Avenue, Suite 2600 |
| | Agana, Guam 96910 | Seattle, WA 98104 |

6

7    This action came before the Court for a court trial. The issues have been tried and a

8 decision has been rendered.

9    IT IS ORDERED AND ADJUDGED that judgment is entered accordance with the Order

10 filed February 19, 1999.

11    Dated at Agana, Guam, this 22nd day of February, 1999.

12    MARY L. M. MORAN
      Clerk of Court

13

14    By:    Rosita P. San Nicolas
             Chief Deputy Clerk

15

16

17

18

19

20

21    Notice is hereby given that this document was
      entered on the docket on 2/22/99
22    No separate notice of entry on the docket will
      be issued by this Court.

23    Mary L. M. Moran
      Clerk, District Court of Guam

24    By: _____ 2/22/99
25    Deputy Clerk          Date

26

27

28

# Plaintiffs' Exhibit 7

FILED
ᵀST ᴵCT COURT OF GUAM

JAN 1 1 1999

MARY L.M. MORAN
CLERK OF COURT

BY: _vb_____ Time: 2:28

DISTRICT COURT OF GUAM

TERRITORY OF GUAM

TCW SPECIAL CREDITS, et al.,

    Plaintiffs,

        vs.

F/V CHLOE Z, et al.,

    Defendants,

Civil Case No. 96-00055

SLOBODAN PRANJIC,

    Plaintiff-in-Intervention,

        vs.

M/V CHLOE Z, et al.,

    Defendants.

ORDER

This case came on for trial on July 27, 1998. At the conclusion of the trial, the Court took the matter under advisement, and thereafter reviewed the trial testimony which was submitted by way of videotape deposition or transcript deposition. The Findings of Fact and Conclusions of Law follow.

**Findings of Fact:**

Slobodan Pranjic was born in Zadar in the Croatian/Bosnian area in 1955, and raised on the Adriatic Sea in Kali, Croatia by his grandfather. He grew up fishing, and after mandatory military service he returned to fishing. He was eventually recruited to fish in the Zuanich fleet by

1

1   fellow Croatian Gobin as a crew member on board the M/V Chloe Z in 1991, **earning $5.50** per
2   ton of tuna.

3          The Zuanich family owned several tuna purse seiners which fished in the **western Pacific**
4   Ocean, and transshipped the tuna through Guam. While out fishing in the **western Pacific**, tuna
5   vessels from the Zuanich fleet tied up normally two to three times per fishing trip.

6          On November 25, 1991, while working in the South Pacific in that capacity, the Chloe Z
7   made arrangements to tie up with the Milagros Z, another of the Zuanich fleet tuna purse
8   seiners. The Chloe Z was in need of certain supplies that the Milagros Z had, such as fuel and
9   fresh food. The two boats tied up sometime between six and seven p.m. Typically, when the
10  boats tie up, all of the crew from both boats come up on deck to socialize. However, plaintiff
11  Pranjic was on duty, working with the net rings that attach to the nets. Pranjic was asked to go
12  to the engine room to get more rings that attach to the bottom of tuna nets. Pranjic then went to
13  the "wet-deck" area with crewmember Blaslov and Chief Engineer Matos; the net rings needed
14  to be welded in the wet-deck area. However, after welding so many rings, many more rings
15  needed repair, and further welding would create unwanted fumes. Chief Engineer Matos told
16  Pranjic to just go over to the Milagros to get more rings. Pranjic then ascended to the deck to
17  cross over to the Milagros Z. Once on deck, he stopped to talk to crewmember Vidov, who
18  was working on the re-fueling process.

19          It was testified that on the ocean that day, there was a "slight" roll, which witnesses
20  testified was no more than two feet, and the light was very good. It was not dark yet.

21          While on deck talking to Vidov, Pranjic witnessed Captain Gobin and crewmember
22  Kurtin cross over between the two boats by jumping from one boat to the other. After talking
23  to Vidov for approximately five minutes, Pranjic then proceeded to carry out the order he had
24  received from Chief Engineer Matos and he jumped from the Chloe Z to the Milagros Z. Before
25  he jumped he had estimated the distance at one meter to four feet apart.

26          His jump failed and he fell into the ocean between the vessels with "big heat" in his left
27
28                                              2

1    ankle. On the way down he tried to grab a davit on the Milagros Z, but he could not hold on.

2    He knew something was dangerously wrong as he flailed in the ocean. He was able to glance at

3    his leg and saw that his foot and the ankle bone above it were bent to a 90 degree angle to his

4    shin. No one saw him fall and no one knows how the ankle broke so severely and ended up at

5    such an angle.

6        Several crewmembers saw him fall and started to call out to him. Moments later, the

7    captain and crewmembers jumped into the water to help him. Pranjic thought that his leg might

8    fall off, so he told them to hold his leg on. It apparently took 12 men to get him out of the

9    water. He was carried out of the water and placed on deck, where the Captain told them to put

10    him in a berth. While being placed in his berth, Pranjic heard his captain tell someone to pull up

11    the bumpers and that he should never have tied up to another vessel without putting out the

12    gangplank.

13        Pranjic was in excruciating pain in his berth when Lipanovich came in with an inflatable

14    cast. He straightened out. Pranjic's leg and put it in the cast. A fleet helicopter was hailed to

15    pick up Pranjic, and he was taken by helicopter to Manas Island, a tiny island off New Guinea,

16    at which point the Zuanich fleet jet arrived on Manas and picked up Pranjic to fly him directly to

17    Guam.

18        On Guam, he was transported directly to Guam Memorial Hospital where he was

19    admitted. He was diagnosed with a comminuted fracture of the left leg. Many pieces were

20    shattered from the end of the tibia and the fibula was shattered and broken off. The next

21    morning he was seen by an orthopedist, Dr. Bollinger, who immediately performed surgery

22    including irrigation and debridement. Dr. Bollinger testified that the injury presented a 5% risk

23    that he would lose the limb. He was subsequently hospitalized for 45 days, with two more

24    surgeries following the first. He was released a couple of days before Christmas, but his wound

25    remained open and he ended up in critical condition again because of an allergic reaction to

26    some medication. He had his third surgery at this time, when the doctor found granulation at

27

28                                     3

1    the original injury site. As of Dr. Bollinger's last visit with Pranjic, he had a 25% chance of

2    developing osteomylitus. He would never regain the full range of mo ion in the limb.

3       Pranjic ended up rehabilitating for the next three months. By March, a representative of

4    the Big Z Fishing Company contacted Pranjic and told him that he either had to go home or fish,

5    and that he could go out on the next fishing trip on the Big Z on their next trip to Samoa.

6    Pranjic testified he did not wish to return to Croatia because of the war there; he testified that

7    "war means no hospital and no medication." So Pranjic traveled to Samoa to board the Big Z,

8    but upon arrival his leg was still so weak that he could not even board the boat under his own

9    power. He needed help to walk on board the vessel, so Lipanovich told him that he simply

10    could not go fishing. Blaslov told him to return to the doctor. Not permitted to board, he

11    returned to San Diego, where he saw two more doctors.

12       One of these doctors was Dr. Ridgley, who told him that eventually, he would have to

13    have the ankle bone fused with the foot bone, but that that was not necessary right away. Dr.

14    Ridgley also testified that the severity of the break was consistent not with a mere bend, or a

15    smashing of the leg against the side of the vessel, but was consistent with a scenario where the

16    ankle was actually trapped against something, or caught inside something, such as a railing as

17    Pranjic fell to the ocean below. The break was not a twist, or the snap of a twig. The limb was

18    crushed, consistent with a scenario where the limb is caught under something as the full weight

19    of the rest of his body pulled against it as he fell. However, it was established at trial that no one

20    knows how the comminuted fracture occurred.

21       Dr. Ridgley performed more surgery, including surgical treatment of severe traumatic

22    arthritis, and cleaning out calcification and bone chips in the ankle. Pranjic was then medically

23    followed by Ridgley and a physical therapist for the next 18 months, when he was said to have

24    reached a "permanent stationary condition" of his left foot. He has endured a total of five

25    operations on the leg.

26       He still limped at the time of trial and is unable to play sports. He has worked in San

27

28                                 4

1 Diego under a work permit as a Bosnian refugee, but that status is likely to expire soon with

2 changes in the relationship between the U.S. government and the Bosnian government. His job

3 is as a helper at a sandwich restaurant in San Diego, where he performs general duties. The

4 bottom part of his left foot below his knee is disfigured and his left leg is shorter than his right,

5 necessitating a riser in his left shoe. He maintains an active lifestyle, and engages in swimming

6 and cycling, but he can no longer play soccer or other sports he used to play which require a

7 strong left leg and balance.

8      A video tape presented at trial, which was procured surreptitiously by private detectives

9 of defendant, shows Pranjic at work and walking to and from his car, and indicates that his

10 ambulation does not suffer except for the slightest limp, though he complains of significant pain

11 and increased exhaustion in the left leg.

12

13 **Conclusions of Law:**

14      The Court finds that the plaintiff has established a lien against the vessel Chloe Z

15 pursuant to the general maritime laws of the United States and pursuant to Supplemental Rules

16 for Certain Admiralty and Maritime Claims C & E, and Rule 9(h) of the Federal Rules of Civil

17 Procedure and for a preferred maritime lien under 46 U.S.C. §31301(5)(B).

18      As to the unseaworthiness cause of action, the plaintiff has the burden of proving the

19 following by a preponderance of the evidence: (1) the Chloe Z was unseaworthy, and (2) the

20 unseaworthy condition was a proximate cause of an injury to the plaintiff. As to the definition of

21 unseaworthiness: A vessel owner has a duty to provide and maintain a seaworthy vessel. A

22 vessel is seaworthy if the vessel and all of its parts and equipment are reasonable for their

23 intended purpose, and it is operated by a crew reasonably adequate and competent for the work

24 assigned. A vessel is unseaworthy if the vessel, or any of its parts or equipment, is not

25 reasonably fit for its intended purpose or if its crew is not reasonably adequate or competent to

26 perform the work assigned. Unseaworthiness is a proximate cause of injury or damage if it

27

28                             5

1  played a substantial part in bringing about injury or damage.

2       If supported by the facts, the principles of contributory negligence would apply to this

3  case. Title 45 U.S.C. §53 provides that if the plaintiff was contributorly negligent, any award

4  may be reduced by the percentage of plaintiff's negligence. If the defendant raises the

5  affirmative defense of plaintiff's negligence, the defendant has the burden of proving each of the

6  following by a preponderance of the evidence: (1) the plaintiff was negligent, and (1) the

7  plaintiff's negligence was a proximate cause of the plaintiff's own injury.

8       A vessel's unseaworthy condition may arise from any number of circumstances, including

9  insufficient number of men assigned to perform shipboard tasks, or the existence of a defective

10  condition, however temporary, on a physical part of the ship. Ribitzki v. Canmar Reading &

11  Bates, Ltd. Partnership, 111 F.3d 658 (9th Cir. 1997). The issue is whether the ship was in an

12  unseaworthy condition as it was tied up to the Milagros Z without the gangplank for crew to

13  pass between, or without instructions to use the skiff to pass between the vessels. As to the

14  proper way to cross between two vessels that are tied up to each other, there was testimony that

15  there were two alternatives, one being putting a gangplank between the vessels and the other

16  being taking a skiff between the vessels.

17       Conditions existing on a vessel can render that vessel unseaworthy. Safety Expert

18  Unterberg testified that though stepping between tied-up tuna vessels is often done in the fishing

19  industry, it is not safe. At the calmest of seas, there is a two to three foot swell. Also, if the

20  ships are in different loading conditions the ships will be at different heights in the water.

21  Further, there is always sea spray in the ocean, even in calm seas, which makes every surface

22  slippery. There was a gangplank on board which was not used. In Expert Unterberg's opinion

23  the use of a gangplank can also be quite dangerous because one can be thrown off the gangplank

24  in rough seas. Expert Unterberg testified that the safest way to cross between vessels was to

25  use a skiff between the vessels. However, Expert Unterberg concluded that a gangplank was

26  safer than nothing, a fact that Chloe Z's Captain Gobin apparently agreed with, judging from his

27

28                         6

1 | comment that he would never attempt or allow a crossing without a gangplank again.

2 | Defense counsel argued that the unsound decision not to put up the gangplank was a
3 | wrong judgment call but it is not unseaworthiness. Human mistake is not unseaworthiness. The
4 | Court disagrees. A configuration on a ship that results in an unsafe condition is unseaworthy.
5 | Further, the fact that the vessel captain had just jumped from one ship to the other indicated that
6 | it was the accepted way of crossing between the vessels. Plaintiff Pranjic was subject to the
7 | authority of the captain. As the lowest paid crewmember, Pranjic in u likely to have asked the
8 | captain to bring out the gangplank for him to cross over, just minutes after the captain himself
9 | had just jumped between the vessels. The Court will not penalize Pranjic for making an unwise
10 | decision when his direct superior had just crossed in the same manner and then admitted after
11 | the accident that it shouldn't have been done that way. Further, Pranjc was carrying out an
12 | order given him by his superior, the Chief Engineer Matos. Matos confirmed that he ordered
13 | Pranjic to go to the Milagros Z, but that he was not on deck and he assumed the gangplank was
14 | out and that Pranjic would cross using the gangplank. Common sense dictates that Pranjic was
15 | obeying Matos' orders by going to the Milagros Z, and when he saw Captain Gobin cross by
16 | jumping, it was tacit approval to cross in this manner. For these reasons, the Court finds no
17 | contributory negligence on Pranjic's part.

18 | In fact, Fish Captain Lipanovich testified that only the fish captain can issue the order to
19 | bring out the gangplank. Both Captain Gobin and crewmember Slobodan Vidov testified that
20 | after Pranjic's accident, every time the Chloe Z tied up to another vessel, the gangplank was
21 | immediately put out. Captain Gobin testified that if the weather is bad, the skiff is used, and if
22 | the weather is good, the gangplank is used. It is no longer permitted to jump between vessels.
23 | For these reasons, the court finds unseaworthiness.

24 | As to damages, defendant presented testimony that since the Zuanich fleet has reduced
25 | its tuna fishing operations out of San Diego, there are vastly fewer Croatians employed in the
26 | fishing industry. Defense Expert Thrush testified that 11 Zuanich vessels employed 224

27

28

7

1   Croatians in past years, now he only has evidence of 18 Croatians presently employed in the

2   tuna fishing industry in 1997 and 1998. The Court rejects this as a basis for discrediting Expert

3   Wallace's testimony, as the Thrush testimony did not take into account the tuna fishing industry

4   from all over the world. The basis of Thrush's testimony was that in San Diego, fewer ships

5   employ Croatians. However, does the worldwide tuna industry also have no jobs for trained

6   crewmembers of tuna purse seiners, Croatian or not? The Court cannot presume that the

7   displaced Croatian tuna crewmembers are unemployable on a worldwide scale.

8           The Court declines to reduce any award by the amount of potential taxes for the reasons

9   stated in companion case, Vjeko Mazic v. M/V Chloe Z.

10          As of the date of trial, Pranjic had sustained medical expenses of $43,951.92.

11          The Court finds that Pranjic is entitled to:

12   1. Medical and incidental expenses in the amount of $43,951.92, as testified to by plaintiff's

13   economist Wallace and unrefuted by defendants;

14   2. Lost present and future earnings of $433,469.00 (using the average tonnage rather than the

15   top 50% tonnage) as testified to by Expert Wallace and as shown on Exhibit 19 of the joint trial

16   exhibits.

17   3. Past pain and suffering of $50,000;

18   4. Future pain and suffering of $50,000.00 (as a non-pecuniary loss, this is not discounted to

19   present day value pursuant to United States v. Hiyashi, 282 F.2d 599, 506 (9th Cir. 1960)).

20          Plaintiff has not shown any support in law for his prayer for pre-judgment interest.

21          Each party is to bear his own costs. The Clerk of Court is to prepare a judgment in

22   accordance with this.

23          SO ORDERED this 11th day of January, 1999.

24   Notice is hereby given that this document was
     entered on the docket on 1/11/99 .
25   No separate notice of entry on the docket will
     be issued by this Court.
26          Mary L. M. Moran
            Clerk, District Court of Guam
27
28
     Deputy Clerk          Date

                                        JOHN S. UNPINGCO
                                        District Judge

Judgment is hereby entered in accordance with the Order filed on January 11, 1999.

Dated at Agana, Guam, this 11th day of January, 1999.

MARY L.M. MORAN
Clerk of Court

By:  Rosita P. San Nicolas
     Chief Deputy Clerk

Notice is hereby given that this document was
entered on the docket on __1/11/99__
No separate notice of entry on the docket will
be issued by this court.

By: _____  1/11/99
    Deputy Clerk         Date

0201

000062

1

2

3

4

5

FILED
DISTRICT COURT OF GUAM

JAN 1 1 1999

MARY L.M. MORAN
CLERK OF COURT

6 DISTRICT COURT OF GUAM

7 TERRITORY OF GUAM

8

| | |
|---|---|
| 9 TCW SPECIAL CREDITS, et al | ) CIVIL CASE NC. 96-00055 |
| Plaintiffs, | ) |
| 10 vs. | ) |
| F/V CHLOE Z, et al, | ) |
| 11 Defendants | ) |
| 12 SLOBODAN PRANJIC, | ) PARTIAL JUDGMENT |
| Plaintiff-in-Intervention | ) |
| 13 vs. | ) |
| M/V CHLOE Z, et al | ) |
| 14 Defendants | ) |

15 D. Paul Vernier        G. Patrick Civille
McKEOWN VERNIER PRICE MAHER    CHING BOERTZEL CIVILLE CALVO & TANG
16 Suite 808, GCIC Bldg.          Suite 400, GCIC Bldg.
414 West Soledad Avenue       414 West Soledad Avenue
17 Agana, Guam 96910           Agana, Guam 96910

18 George Butler             Anita P. Arriola
BUTLER & TELFORD BUTLER      ARRIOLA, COWAN & ARRIOLA
19 Suite 203, American Life Bldg.    P.O. Box X
137 Murray Blvd.           Agana, Guam 96932
20 Agana, Guam 96910

21 Bill R. Mann              Cesar Cabot
BERMAN O'CONNOR & MANN      Law Offices of Cesar C. Cabot
22 Suite 503, Bank of Guam Bldg.    Suite 102, First Savings & Loan Bldg
111 Chalan Santo Papa       655 S. Marine Drive
23 Agana, Guam 96910          Tamuning, Guam 96911

24 Steven Zamsky           Lawrence J. Teker
Zamsky Law Firm         GAYLE & TEKER
25 Suite 501, Bank of Guam Bldg.    Suite 200, Gayle & Teker Bldg.
111 Chalan Santo Papa       330 Hernan Cortez Avenue
26 Agana, Guam 96910          Agana, Guam 96910

27 . . . . . . . .

28 . . . . . . . .

# Plaintiffs' Exhibit 8

Maos

| | | | | | |
|---|---|---|---|---|---|
| Date of valuation | 1-Oct-06 | | Amount of judgement | $ | 621,515 |
| Date of incident | 8-Aug-92 | | | | |
| Date of judgement | 19-Feb-99 | | | | |

Pre-judgement interest

| From | To | # Year | Amount | Interest | Total |
|---|---|---|---|---|---|
| 8-Aug-92 | 7-Aug-93 | 1.00 | $621,515 | $ 31,262 | $ 652,777 |
| 8-Aug-93 | 7-Aug-94 | 1.00 | | $ 32,835 | $ 685,612 |
| 8-Aug-94 | 7-Aug-95 | 1.00 | | $ 34,486 | $ 720,098 |
| 8-Aug-95 | 7-Aug-96 | 1.00 | | $ 36,221 | $ 756,319 |
| 8-Aug-96 | 7-Aug-97 | 1.00 | | $ 38,043 | $ 794,362 |
| 8-Aug-97 | 7-Aug-98 | 1.00 | | $ 39,956 | $ 834,318 |
| 8-Aug-98 | 18-Feb-99 | 0.53 | | $ 22,242 | $ 856,560 |
| | | 6.53 | | $ 235,045 | |

Post-judgement interest

| From | To | # Year | Amount | Interest | Total |
|---|---|---|---|---|---|
| 19-Feb-99 | 7-Aug-99 | 0.47 | $856,560 | $ 19,002 | $ 875,562 |
| 8-Aug-99 | 7-Aug-00 | 1.00 | | $ 41,327 | $ 916,889 |
| 8-Aug-00 | 7-Aug-01 | 1.00 | | $ 43,277 | $ 960,166 |
| 8-Aug-01 | 7-Aug-02 | 1.00 | | $ 45,320 | $ 1,005,486 |
| 8-Aug-02 | 7-Aug-03 | 1.00 | | $ 47,459 | $ 1,052,945 |
| 8-Aug-03 | 7-Aug-04 | 1.00 | | $ 49,699 | $ 1,102,644 |
| 8-Aug-04 | 7-Aug-05 | 1.00 | | $ 52,045 | $ 1,154,689 |
| 8-Aug-05 | 7-Aug-06 | 1.00 | | $ 54,501 | $ 1,209,190 |
| 8-Aug-06 | 30-Sep-06 | 0.15 | | $ 8,561 | $ 1,217,751 |
| | | 7.62 | | $ 361,191 | |
| | | 14.15 | $621,515 | $ 596,236 | $ 1,217,751 |

Notes:

Interest is computed daily, and compounded annually.

Interest used for

| | |
|---|---|
| Pre-judgement | 5.03% |
| Post-judgement | 4.72% |

# Pranjic

| | | |
|---|---|---|
| Date of valuation | 1-Oct-06 | |
| Date of incident | 25-Nov-91 | |
| Date of judgement | 11-Jan-99 | |

Amount of judgement     $577,421

## Pre-judgement interest

| From | To | # Year | Amount | Interest | Total |
|---|---|---|---|---|---|
| 25-Nov-91 | 24-Nov-92 | 1.00 | $ 577,421 | $ 28,640 | $ 606,061 |
| 25-Nov-92 | 24-Nov-93 | 1.00 | | $ 30,061 | $ 636,122 |
| 25-Nov-93 | 24-Nov-94 | 1.00 | | $ 31,552 | $ 667,673 |
| 25-Nov-94 | 24-Nov-95 | 1.00 | | $ 33,117 | $ 700,790 |
| 25-Nov-95 | 24-Nov-96 | 1.00 | | $ 34,759 | $ 735,549 |
| 25-Nov-96 | 24-Nov-97 | 1.00 | | $ 36,483 | $ 772,032 |
| 25-Nov-97 | 24-Nov-98 | 1.00 | | $ 38,293 | $ 810,325 |
| 25-Nov-98 | 10-Jan-99 | 0.13 | | $ 5,225 | $ 815,550 |
| | | 7.13 | | $ 238,129 | |

## Post-judgement interest

| From | To | # Year | Amount | Interest | Total |
|---|---|---|---|---|---|
| 11-Jan-99 | 25-Nov-99 | 0.87 | $ 815,550 | $ 32,355 | $ 847,905 |
| 26-Nov-99 | 25-Nov-00 | 1.00 | | $ 38,664 | $ 886,569 |
| 26-Nov-00 | 25-Nov-01 | 1.00 | | $ 40,428 | $ 926,997 |
| 26-Nov-01 | 25-Nov-02 | 1.00 | | $ 42,271 | $ 969,268 |
| 26-Nov-02 | 25-Nov-03 | 1.00 | | $ 44,199 | $1,013,466 |
| 26-Nov-03 | 25-Nov-04 | 1.00 | | $ 46,214 | $1,059,680 |
| 26-Nov-04 | 25-Nov-05 | 1.00 | | $ 48,321 | $1,108,002 |
| 26-Nov-05 | 30-Sep-06 | 0.84 | | $ 42,441 | $1,150,443 |
| | | 7.71 | | $ 334,893 | |
| | | 14.84 | $ 577,421 | $ 573,022 | $1,150,443 |

Notes:

Interest is computed daily, and compounded annually.

Interest used for

| | |
|---|---|
| Pre-judgement | 4.96% |
| Post-judgement | 4.56% |