Michael A. Barcott
**HOLMES WEDDLE & BARCOTT**
999 Third Avenue, Suite 2600
Seattle, Washington 98104
(206) 292-8008 Telephone
(206) 340-0289 Facsimile

Anita P. Arriola
**ARRIOLA, COWAN & ARRIOLA**
259 Martyr Street, Suite 201
Hagatna, GU 96932
(671) 477-9730 Telephone
(671) 477-9734 Facsimile

Attorneys for the M/V CHLOE Z

**FILED**
DISTRICT COURT OF GUAM

JAN 16 2007

MARY L.M. MORAN
CLERK OF COURT

# DISTRICT COURT OF GUAM

# TERRITORY OF GUAM

| | |
|---|---|
| TCW SPECIAL CREDITS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> FISHING VESSEL M/V CHLOE Z, et al., <br><br> Defendants. | Case No. 96-00055 <br><br> **CHLOE Z'S OPPOSITION TO MOTION TO WITHDRAW FUNDS** |

In a brief devoid of citation to even one case, Mssrs. Matos and Pranjic, through counsel, make the modest proposal that, among other things, the CHLOE Z post a bond in the sum of $4,750,000.00. *See* Motion at p. 4, lns. 17-19. In their brief, Matos and Pranjic cite rules that do not apply to this proceeding and present an "argument" that is almost impossible to follow. The CHLOE Z will respond to these arguments by reference to Matos and Pranjic's numbered paragraphs. Prior to addressing those specific issues, however, a brief overview of the pertinent details of this case may be beneficial for this Court, given the lengthy and potentially confusing history of this litigation. Although the docket entries number in the thousands, it is, in fact, very near the end, and the pertinent issues are easily understood.

## SIGNIFICANT PROCEDURAL STATUS

In July 1996 TCW Special Credits commenced this *in rem* action by arresting the fishing vessel CHLOE Z to foreclose on a mortgage. Several months thereafter, Mssrs. Matos and Pranjic, who had been injured on the CHLOE Z, intervened in this action to pursue their *in rem* claims against the funds held in the registry of the Court.[1] Matos and Pranjic had previously pursued *in personam* claims against the owner of the CHLOE Z in a separate action which went to trial in July 1996. They evidently elected to intervene in this *in rem* action because the *in personam* judgments obtained following trials in 1996 were uncollectable.

The *in rem* injury claims of Matos and Pranjic went to trial before Judge Unpingco in July 1998 and resulted in awards in favor of Mr. Matos in the amount of $621,514.50, *See* Order, Feb. 19, 1999, Ex. 1, and in favor of Mr. Pranjic in the sum of $577,420.92. *See* Order, Jan. 11, 1999, Ex. 2. Subsequently, Pranjic conceded before the Ninth Circuit that the court erred in awarding $43,951.92 in past medical expenses so his amended partial award was $533,469.00. *See* Order, Oct. 25, 2000, Ex. 3. To date, those are the only sums which have ever been awarded to Mr. Pranjic and Mr. Matos. Those sums total $1,154,983.50, significantly less than is currently being held by the Court. In the awards entered and amended, Judge Unpingco specifically <u>denied</u> prejudgment interest. *See* Ex. 1, p. 10, and Ex. 2, p. 8. The topic of prejudgment interest is the subject of a prior motion which this Court recently referred to the magistrate for a recommendation.

During the pendency of these *in rem* personal injury claims, certain disbursements have been made from the vessel sale proceeds. <u>Each and every disbursement</u> was made following a properly noted motion with either the explicit or tacit consent of Pranjic and Matos.

Contrary to plaintiffs' assertion, there are currently no "judgments" in favor of either Matos or Pranjic. The awards which were entered in 1999 were appealed to the Ninth Circuit and <u>reversed</u> and remanded for further proceedings. *See* Ex. 4 (Matos) and Ex. 5 (Pranjic). In

---

[1] These funds represented the proceeds from the sale of the CHLOE Z.

ARRIOLA, COWAN & ARRIOLA, HAGATNA, GUAM 96910

those further proceedings, which consisted of a two-day long evidentiary hearing in May 2003, Judge Unpingco concluded that the statute of limitations barred these claims. *See* Order, April 8, 2004, Ex. 6. Thus, following the May 2003 evidentiary hearing, these claims resulted in judgments which were defense verdicts. *See* Order, April 9, 2004, Ex. 7. That finding was recently reversed by Ninth Circuit but, to date, <u>no additional judgments have been entered</u>. The date that this Court might utilize to enter those "judgments" is one of the topics extant in the motion regarding interest currently under consideration.

With this background CHLOE Z turns to the issues raised by Matos and Pranjic and will respond in sections numbered to coincide with the numbering of plaintiffs' brief.

### PARAGRAPH 1

Plaintiffs' paragraph 1 accurately sets forth that the motion to establish prejudgment interest and postjudgment interest is currently pending.

### PARAGRAPH 2

Plaintiffs' paragraph 1 accurately sets forth that Matos and Pranjic filed their status report on October 23rd.

### PARAGRAPH 3

Matos and Pranjic did file their request for judicial appointment of Judge John Coughenour. Contrary to plaintiff's assertion, however, that request is no longer pending and has been denied.

### PARAGRAPH 4

Plaintiffs have cited no judicial authority for an "accounting." Paragraph 4 is more properly directed to TCW, which has coordinated the investment and withdrawals of the funds held in the registry of the Court. CHLOE Z does not have the information regarding all of those investments and disbursals. It should be noted, however, that to the best of CHLOE Z's understanding, each and every disbursal was made following motions properly noted and with either the explicit or tacit approval of counsel for Matos and Pranjic. There are court orders

ARRIOLA, COWAN & ARRIOLA, HAGATNA, GUAM 96910

concerning each of those disbursals. Neither CHLOE Z nor TCW should have to go back and reconstruct for plaintiffs' counsel those transactions which are part of the court record.

Plaintiffs also allude to Sphere Drake in this paragraph. Sphere Drake is the Protection and Indemnity underwriter for the CHLOE Z. It is not a party to this case. Plaintiffs previously attempted to sue Sphere Drake in this case. Judge Unpingco dismissed that action on October 23, 1997. *See* Ex. 8. As Sphere Drake is not a party to this litigation, the court is without the authority to issue orders requiring it to produce an accounting.

## **PARAGRAPH 5**

The CHLOE Z filed its Petition for Writ of Certiorari to the United States Supreme Court on December 28, 2006. Attached to this opposition as Exhibit 9 is a declaration from CHLOE Z's Supreme Court counsel. As the Court will see from a review of that declaration, counsel David Frederick has extensive experience both clerking for, and appearing before, the United States Supreme Court and is familiar with the Court's procedures. The Supreme Court should issue an order on March 19, 2007, indicating whether the Petition for Writ of Certiorari is granted or not. If Matos and Pranjic request an extension of time to respond to the Petition for Writ of Certiorari, that order will be issued on April 16, 2007. *See* Exhibit 9, ¶¶ 4 and 5.

Matos and Pranjic first received awards in their favor in early 1999. Since that time, there have been two appeals to the Ninth Circuit. At no time in the past eight years have Matos and Pranjic made a request that funds be withdrawn from the court. For some curious reason, now on the eve of the United States Supreme Court acting on this matter, they find themselves in a great rush to request a withdrawal of funds of $2,375,000.00. This, in spite of the fact that the most they would be entitled to withdraw once judgments are entered (prior to a ruling on the interest issue) is the amount awarded by Judge Unpingco, $1,154,983.50. As discussed in the following paragraph, even a request to withdraw the smaller sum should be denied at this point.

There are no judgments currently in favor of Matos and Pranjic. For this reason alone, the request made in paragraph 5 should be denied. Moreover, a grant of the Petition for Writ of Certiorari will likely signal that the Supreme Court intends to reverse the Ninth Circuit Court of

ARRIOLA, COWAN & ARRIOLA, HAGATNA, GUAM 96910

Appeals and that these awards will once again be stricken, and in conformity with Judge Unpingco's ruling in May 2003, plaintiffs awarded nothing. Of course, should this court order that the funds be disbursed to Matos and Pranjic (and their counsel) prior to the time the Supreme Court determines whether to grant the petition it will, as a practical matter, be extraordinarily difficult, if not impossible, to recoup those funds from Matos and Pranjic if the Supreme Court accepts the case and affirms Judge Unpingco. There is simply no need to rush to this procedure after eight years, especially given that the funds held in the court are more than adequate to pay the outstanding award.

## PARAGRAPH 6

In paragraph 6, plaintiffs ask this Court, in lieu of the withdrawal of funds, to require the CHLOE Z to post a bond to secure Matos and Pranjic's judgment. This request reveals a significant misunderstanding of the nature of an *in rem* proceeding. The <u>most</u> that plaintiffs can recover in an *in rem* proceeding such as this is the *res* held in the registry of the court. That *res* serves as its own security. If judgment is entered in favor of the plaintiffs the dollars in the registry of the court are precisely the security required to satisfy those judgments. That security apparently has been adequate for plaintiffs for the past eight years. The funds are invested and continue to grow with accrued interest. There is no need for a supersedeas bond.

This Court has great discretion to stay execution upon a judgment if another type of security is in place, or even without the posting of any security at all. In *Curtiss-Wright Corp. v. General Elec. Co.*, 446 U.S. 1, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980), the Supreme Court noted that a district court has the authority to protect the interests of both appellants and appellees by holding funds deposited in the court pending the outcome of appeal under Fed. R. Civ. P. 62(h). In *Transworld Airlines, Inc. v. Hughes*, 515 F.2d 173 (2d Cir. 1975), the district court granted a stay of execution pending appeal where the appellant posted security by way of a letter of credit and a promise to maintain its net worth at more than three times the amount of the difference between the letter of credit and the amount of the judgment in question. In *Federal Prescription Service, Inc. v. American Pharmaceutical Ass'n.*, 636 F.2d 755 (D.C. Cir. 1980), it was held that

ARRIOLA, COWAN & ARRIOLA, HAGATNA, GUAM 96910

the district court had discretion to stay execution upon a judgment without the posting of any security whatsoever by the defendant. In that case, the court reasoned that the district court could "order partially secured or unsecured stays if they do not unduly endanger the judgment creditor's interest in ultimate recovery."

Here, there is no need for additional security as the plaintiffs have every dollar they might ever collect being held in the court's registry. Indeed, what is apparent is that plaintiffs are using this motion to try to increase their collectable judgment, not secure it.

Matos and Pranjic cite 28 U.S.C. § 2464 as a purported authority for a bond in the amount of twice the damages claimed. Plaintiffs apparently do not understand the purpose of this statute. 28 U.S.C. § 2464 allows for a bond in lieu of a vessel arrest. This allows a vessel owner to continue to utilize their vessel upon posting such a bond. *In Re Moore,* 278 F. Supp. 260, 266 (D. Mich. 1968). As stated in that statute, "Thereupon the execution of all such process against such vessel shall be stayed . . . ." The day has long since passed for this type of bond. The vessel CHLOE Z was arrested and sold over a decade ago. This type of bond, which the vessel owner can post in lieu of arrest, has no part to play in the current proceedings. Plaintiffs' security is not with such a bond, rather it is in the funds being held in the registry of the court. Plaintiffs' brief cites 28 U.S.C. § 2461(b) for the proposition that this court may make necessary orders concerning such bonds. *See* p. 4, lns. 19-20. A review of that statute indicates it has nothing to do with civil admiralty cases. It appears that plaintiffs intended to cite 28 U.S.C. § 2464(b). That section has to do with the court's orders concerning bonds in lieu of arrest, which are not part of the procedure involved in these claims. *See* generally *Moore v. M/V ANGELA,* 353 F. 3d 376 (5th Cir. 2003).

## PARAGRAPH 7

In paragraph 7 plaintiffs seek to invoke Supplemental Admiralty Rule F(7). Admiralty Rule F applies to complaints for Limitation of Liability. The Limitation of Liability Act is contained in 46 U.S.C. App. § 181 through 195. This is not a limitation proceeding, has never been a limitation proceeding, and Admiralty Rule F has nothing to do with this proceeding. In

ARRIOLA, COWAN & ARRIOLA, HAGATNA, GUAM 96910

personal injury matters, limitation actions are filed when the owner of a vessel affirmatively goes into court to seek to limit liability under the terms of 46 U.S.C. App. § 185. Supplemental Admiralty Rule F applies to these actions. *See Wright, Miller & Marcus,* Federal Practice and Procedure § 3252 *et. seq.* The present case is a mortgage foreclosure action to enforce a maritime lien governed by Rule C of the Supplemental Admiralty Rules. *Wright, Miller & Marcus, supra.,* at § 3221, *et seq.*

Indeed, when counsel for Matos and Pranjic was deposed in this action on the issue of the statute of limitations he testified that he did not know what a Limitation of Liability action was. *See* deposition of Dwight Ritter, Ex. 10, pp. 12-13. The attorney representing Mr. Ritter in that deposition objected to questions about the Limitation of Liability Act, stating: "[T]he present case did not involve a sinking of a vessel, so Limitation of Liability Act would not have applied." Ex. 10, p. 12, line 24 through p. 13, line 1. Counsel making the objection was correct. This is not a Limitation proceeding.

## PARAGRAPH 8

Paragraph 8 is merely a "conclusion" and all of the arguments concerning this matter have been raised in the preceding paragraphs.

## CONCLUSION

Wherefore, CHLOE Z respectfully requests that this motion be denied in its entirety.

RESPECTFULLY SUBMITTED this 16th day of January, 2007.

**ARRIOLA, COWAN & ARRIOLA**

By: _____
   for **ANITA P. ARRIOLA**
    Attorneys for F/V CHLOE Z

FILED
DISTRICT COURT OF GUAM

FEB 1 8 1999

MARY L.M. MORAN
CLERK OF COURT

1
2
3
4
5 **DISTRICT COURT OF GUAM**
6 **TERRITORY OF GUAM**
7
8 TCW SPECIAL CREDITS, et al.,
9     Plaintiffs,
10     vs.
11 F/V CHLOE Z, et al.,
12     Defendants,
13
14 ROBERT MATOS,
    Plaintiff in Intervention,
15
    vs.
16
17 F/V CHLOE Z, et al.,
    Defendants.
18

Civil Case No. 96-00055

**RECEIVED**
ARRIOLA, COWAN & ARRIOLA

FEB 22 1999

BY _____ TIME: 12:05

**ORDER**

19     This case came on for trial on July 20, 1998. At the conclusion of the trial, the Court
20 took the matter under advisement, and thereafter reviewed the trial testimony which was
21 submitted by way of videotape deposition or transcript deposition. The Findings of Fact and
22 Conclusions of Law follow.
23 **Findings of Fact:**
24     Robert Matos, a 39 year old Portuguese American who settled in San Diego, began
25 fishing after high school and aspired to be an ship's engineer. He eventually earned a U.S. Coast
26 Guard Chief Engineer's license but worked as an assistant engineer on board the Chloe Z tuna
27
28

1

**EXHIBIT** _1_

1 | purse seiner, a ship belonging to the Zuanich fleet and fishing in the Western Pacific.

2 | On Trip #11 with the Chloe Z, a situation arose on August 8, 1992, in which Matos, as

3 | assistant Engineer of the vessel, had to lift a strainer as a part of his regular duties. The strainer

4 | was a two foot by six inch strainer which weighed 44 pounds. Matos was asked to give a

5 | helping hand to crewmembers Kolega and Vidov who were trying to lift it for routine cleaning.

6 | As he entered the strainer room, he observed two individuals (non-engineers) trying to

7 | lift the strainer. Matos testified that since he understood straining equipment, he thought he

8 | could lift it himself better than the untrained crew who were trying to lift it at that time. In his

9 | career he had lifted many strainers. Matos positioned himself to lift the strainer and lifted. He

10 | testified that he was in a squat position as he started to lift. He could not lift it, in fact, he

11 | severely strained his back in the process and had to immediately retire to his berth to rest.

12 | Others then lifted the strainer using a crow-bar type instrument for leverage — it lifted easily.

13 | Following his injury, Matos reported his injury to Chief Engineer Moraro and was taking

14 | painkillers. His duties had to be lightened because of his injury.

15 | Though expert career engineer Copitas testified that the strainer was made of materials

16 | fit for its intended duties, evidence is strong to the contrary. The strainer collects debris sucked

17 | up from the pipe alley and the engine room. However, Expert Patterson testified that the

18 | strainer was composed of mild steel. Mild steel is a ferrous metal which was inappropriate for

19 | use on a vessel at work in the high seas for months at time because ferrous metals corrode faster

20 | than non-ferrous metals. A strainer is a piece of equipment which must be cleaned frequently at

21 | sea. Because of this the strainer must be made of materials which are easy to clean. The

22 | previous strainer in this vessel was made of non-corrosive metals. The constant exposure to

23 | seawater contributed to the rusting of these materials and the corrosion caused the flange to

24 | freeze inside the cannister. Career Engineer Copitas testified that lighter strainers were available.

25 | The strainer which Matos lifted was custom made and installed at Casamar Shipyards on

26 | Guam. This larger strainer was installed, replacing the prior, smaller, one, which had

27 |

28 | 2

0174

1   deteriorated. However, an identical strainer could have been installed but was not. There was
2   testimony that this was because the prior strainer could not quickly clean the bilge as fast as the
3   new one, and in an effort to increase the efficiency of the ship, the larger strainer was ordered.
4   This is consistent with Moraro's testimony that the lighter strainer clogged more easily. The
5   strainer is a very important piece of safety equipment on board, because the strainer must be able
6   to be lifted very quickly if the ship is ever in a position that it is taking on water. As was stated
7   at trial, if it takes a lot of time to lift the strainer, the ship may have already taken on enough
8   water to sink, thus the importance of a liftable strainer. Matos testified that he had once lifted
9   the prior strainer with one finger. In the 17 years that Matos had fished he had never seen a
10  strainer like this, and had no reason to expect it to be any heavier than the lighter strainers he
11  had worked with on other boats. There was also evidence that all other strainers on board were
12  of the lighter variety that Matos was familiar with, in fact the predecessor to the strainer in
13  question was reportedly the size of a coffee can.

14       A second incident took place on Trip #12 which exacerbated Matos' injury. The ship
15  was docked in Tinian and the fish in the hold were frozen together. There was testimony that
16  the fish were stuck because of improper freezing and packing of the fish, which is the
17  responsibility of the Chief Engineer. The decision was made by the Chief Engineer to use seal
18  bombs to dislodge the fish. When the seal bomb explosion went off it resulted in a pipe in the
19  pipe alley bursting. Matos was asleep at this time, as it was 6 a.m. and he had been on watch all
20  the previous night. When the pipe burst he was awakened by then Chief Engineer Leinert and
21  asked to come attend to the emergency. In order to stop the pipe leak, he needed to loosen a
22  bolt on the pipe flange. Chief Engineer Moraro instructed Matos to do so to stop the flooding.

23       Removal of bolts is a standard part of an engineer's duties on board his assigned vessel.
24  The bolt that Matos had to loosen was made of mild steel galvanized rather than stainless steel.
25  Matos could not tell from looking at the bolt that it was frozen. Once he tested it he realized it
26  was frozen so he decided to loosen it with a "cheater bar" and a wrench on the bolt. He had to
27
28                                              3

0175

1  again position himself to put sufficient pressure on that bolt. The flooring was wet because of
2  the flooding. He was wearing his engineer boots. He tested his footing and thought his footing
3  was adequate to prevent injury. He then had to step off the cat walk. He pulled on the bolt hard
4  only once, but hard enough that he fell against the wrench which made him slip and fall
5  backwards. His foot immediately went numb and he felt intense pain. He had again injured his
6  back.

7       To eventually remove the bolts, they were cut off by torch by Leinert, though there was
8  testimony that the ship's captain ordered the torching to stop because it was creating toxic
9  fumes.

10      Often, an oxygen acetylene torch is used to remove a stuck bolt. However, the risk of
11  toxic fumes from the burning of PVC plastic prevented this from being a safe alternative. There
12  was also testimony that "penetrating oil" is also sometimes used but that it takes several hours to
13  work on a stuck bolt. Because of the rushing water, Matos did not have time to use penetrating
14  oil to loosen the bolt.

15      Immediately after the injury, he was assisted to Chief Engineer's quarters and given
16  codeine painkillers and was outfitted with a back brace. As the ship was on its way to Guam,
17  Matos did not ask for any special transportation to Guam.

18      The Chloe Z docked on Guam two days later, and Matos was taken immediately to
19  Guam Memorial Hospital. He was x-rayed and given medication for muscle spasms. He was
20  not admitted to the hospital but returned to the boat to convalesce. Moraro recommended back
21  massages and a chiropractor, which did not improve Matos' pain. The vessel left again for a
22  fishing trip, but Matos' leg remained numb, and this restricted his capacity to perform his duties
23  on the trip. He was unable to ascend or descend stairs. His numbness increased and his bowels
24  quit working, so he asked the captain to drop him in the next port, which was Kosrae in the
25  Federated States of Micronesia. He immediately went to the doctor in Kosrae, who told him
26  that he needed treatment in the mainland. He proceeded immediately to Los Angeles. Upon

27

28                          4

0176

1   arrival in California he was examined by a doctor and told that he had two herniated discs and
2   needed surgery. He underwent the recommended surgery and the ensuing physical therapy.
3          He is still undergoing physical therapy. He still experiences numbness and pain in his
4   arms and legs. He cannot sit or stand for too long. He also suffered depression from the loss of
5   his ability to work on a fishing trip and from the loss of a more physical lifestyle (surfing and
6   skiing). He is also still being medicated. Because he could not work in the fishing industry any
7   longer, he attended card dealer school in his home town of Las Vegas. He works now as a
8   dealer in a casino, presently earning $32,000.00 per year. His lifestyle has suffered because he
9   has not been able to make the average of $75,000 to $80,000 per year he was making in the tuna
10  industry. The only restriction from his back injury on Matos' new career as a casino worker is
11  that he cannot work the craps table because of the bending required.
12  ///
13  ///
14  ///
15  ///
16  ///
17  ///
18  ///
19  ///
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

5

**Conclusions of Law:**

1
2      The Court finds that the plaintiff has established a lien against the vessel Chloe Z
3 pursuant to the general maritime laws of the United States and pursuant to Supplemental Rules
4 for Certain Admiralty and Maritime Claims C & E, and Rule 9(h) of the Federal Rules of Civil
5 Procedure and for a preferred maritime lien under 46 U.S.C. §31302(j)(6).

6      As to the unseaworthiness cause of action, the plaintiff has the burden of proving the
7 following by a preponderance of the evidence: (1) the Chloe Z was unseaworthy, and (2) the
8 unseaworthy condition was a proximate cause of an injury to the plaintiff. As to the definition of
9 unseaworthiness: A vessel owner has a duty to provide and maintain a seaworthy vessel. A
10 vessel is seaworthy if the vessel and all of its parts and equipment are reasonable for their
11 intended purpose, and it is operated by a crew reasonably adequate and competent for the work
12 assigned. A vessel is unseaworthy if the vessel, or any of its parts or equipment, is not
13 reasonably fit for its intended purpose or if its crew is not reasonably adequate or competent to
14 perform the work assigned. Unseaworthiness is a proximate cause of injury or damage if it
15 played a substantial part in bringing about injury or damage.

16      If supported by the facts, the principles of contributory negligence would apply to this
17 case. Title 45 U.S.C. §53 provides that if the plaintiff was contributorily negligent, any award
18 may be reduced by the percentage of plaintiff's negligence. If the defendant raises the
19 affirmative defense of plaintiff's negligence, the defendant has the burden of proving each of the
20 following by a preponderance of the evidence: (1) the plaintiff was negligent, and (1) the
21 plaintiff's negligence was a proximate cause of the plaintiff's own injury.

22      The issue is whether the ship was in an unseaworthy condition as configured with the
23 strainer outfitted by Casamar, and further whether the use of the mild steel bolts presented a
24 further unseaworthy condition.

25      Though lifting a strainer may have been a routine task for an assistant engineer, this does
26 not relieve the vessel owner of providing a seaworthy vessel, which includes making sure that
27
28

6

0178

1   the equipment on the ship was fit for its intended purpose. The Chief Engineer (Moraro) had

2   the legal duty to ensure that safe equipment is used for the purposes of the tuna vessel. The

3   Court finds that the strainer was too heavy for its intended purpose and that the use of mild steel

4   bolts in the pipe alley, where sticky bolts can create emergencies, was also unsuitable.

5        The doctrine of unseaworthiness requires that the vessel, including the hull, the decks, or

6   the machinery, be reasonably fit for the purpose for which they are used. Gutierrez v.

7   Waterman S.S. Corp., 373 U.S. 206 (1963). The vessel components were not reasonably fit for

8   their intended purpose. There was indication that there were stainless steel bolts on board that

9   could have been traded out for the mild steel bolts but were not. After Matos' injury however,

10  Chief Engineer Leinert removed all mild steel bolts and replaced them by stainless steel bolts.

11       Defendant's expert engineer Copitas testified that there was no unseaworthy condition

12  on board the Chloe Z, but he has never even been on board the Chloe Z and has never seen the

13  strainer or the pipe alley in which Matos injured himself. He did testify that the Chief Engineer

14  of a vessel makes the decision to approve what type of strainer to install on the vessel. He

15  decides where it goes and what size it is. However, even Chief Engineer Moraro testified that

16  the configuration of the strainer was defective and inappropriate.

17       Though Matos held a Coast Guard Chief Engineer's license, there was a practice on the

18  Zuanich tuna boats to place Croatians in the higher positions and to put the Coast Guard

19  licensees on board as paper officers such as "paper captains" etc. Though Copitas testified that

20  Matos was the nominal "chief engineer" the Court finds this completely incredible because

21  Moraro was receiving $27.50 per ton of tuna and Matos was receiving $14.50 per ton of tuna.

22  Even Copitas stated that Matos took his orders from the Chief Engineer. For this reason,

23  though Matos held a Chief Engineer's license, the Court will not hold him to the standard of a

24  chief engineer because he did not get paid as a chief engineer. All experts and percipient

25  witnesses have confirmed that Matos was subject to the authority of Chief Engineer Moraro and

26  had to follow his orders.

27

28                                              7

1       Copitas also testified that seal bombs should never be used on any tuna boat. No Chief

2 Engineer should allow seal bombs to be present on the vessel. There are much safer alternatives

3 to unsticking fish than the use of seal bombs. It is the Chief Engineer's responsibility to make

4 sure the fish are not packed too tightly, and that the salinity is correct. When fish are too tightly

5 packed and freeze together it is the direct responsibility of the engineer, and the safest way to

6 relieve it is to drain the hold and re-pump the water in the hold, and drain and re-freeze, etc.,

7 until the fish loosen. However, there was testimony that this was not done because they were

8 not allowed to pump brine into Tinian harbor by law. Seal bombs were chosen as the fastest

9 alternative, but there was testimony that the Chief Engineer should have prevented the frozen

10 tuna in the first place.

11       As to contributory negligence, the Court does not accept Expert Copitas' opinion that

12 Matos' injuries were 100% his fault. The strainer was too large and heavy and made of the

13 wrong materials, and the bolts were made of the wrong materials. However, as a holder of a

14 Chief Engineer's license, the Court holds him to a higher standard, as he is in a position to make

15 discretionary decisions in his position that a mere crewmember would not have the discretion to

16 make. Matos was told to lift the strainer, and he was told to loosen the bolt. He was not told

17 how to do so (as opposed to a non-specialized crewmember being told how to cross between

18 boats — albeit tacitly, or being told specifically how to cross over blowers). Because he

19 exercised his own decision-making powers in deciding how to do something, the Court is

20 compelled to assign some of the duty of care to him. The Court finds that Matos was 33%

21 negligent in his injuries. Pursuant to the principles of contributory negligence, his award will be

22 reduced by this amount.

23       The Court declines to find more negligence on Matos' part because there is no question

24 that he was injured in performing his duties. He would not have been injured but for the

25 unseaworthy equipment on the boat. When a young man's injuries result from service to his

26 employer and that young man's career aspirations are ruined by that injury, the ship that

27

28

8

0180

1  benefitted from the hard work cannot avoid responsibility for the resulting loss. The service
2  rendered by Matos were meant to benefit the Chloe Z to the severe detriment of Matos, despite
3  the fact that he approached the task at hand with perhaps an injudicious manner.

4      The Court finds that Matos is entitled to:

5  1. Medical and incidental expenses as prayed for in the complaint;

6  2. Lost present and future earnings in an amount to be calculated thus: In one of Matos' most
7  successful years, he fished 7 months per year. Expert Wallace figured, as shown on Exhibit 68
8  of the joint trial exhibits, that Matos would take off only one month per year, therefore Wallace
9  presumes that Matos will fish for 11 months per year. It is not credible that he would have
10 fished for 11 months per year for 22.85 years. The Court splits the difference and will grant
11 damages in the amount to be calculated at fishing nine months of the year, up to age 61. The
12 Court also accepts the scenario that Matos would have been a Chief Engineer later in his career.
13 The Court accepts the figure presented by Expert Wallace of $1,126,025, representing the
14 summary of economic loss, offset by wages and benefits received, working as an Assistant
15 Engineer until approximately age 40, and thereafter as a Chief Engineer, using the average
16 tonnage of the tuna fleet of the Western Pacific. Plaintiffs presented insufficient evidence to
17 compel the Court to the conclusion that Matos would have stayed within the top 50% of the
18 tuna fleets of the Western Pacific.

19     Expert Wallace's opinions did not present an alternative for lost wages for working only
20 nine months per year rather than eleven months per year. The lost wages as presented in
21 Wallace's deposition is not broken down by month. The Court has no choice, therefore, but to
22 simply reduce the loss of wages and benefits by 16.66%, which represents the difference
23 between 11/12 (eleven of twelve months) and 9/12 (nine of twelve months), resulting in the
24 following calculations:

25 Past period (net of taxes):                          $333,369 less 16.66% = $277,829.73
       Loss of wages and taxes
26 Less: Offset Wages and Benefits:                     $67,771
   SUBTOTAL: Past period:                               $210,058.73
27

28                                   9

| | |
|---|---|
| Future period (in present value dollars and net of taxes): | $1,457,696 – 16.66% = $1,214,842.85 |
| Less: Offset Wages and Benefits: | $597,269 |
| SUBTOTAL: | $617,574.85 |
| TOTAL ECONOMIC LOSS: | $827,633.58 |

The Court accepts the 4% discount as provided for by economist Wallace. Because Matos is a U.S. Citizen, the Court also accepts that the U.S. tax rates should apply. The contributory negligence factor of 33% is applied to this figure, resulting in a final lost present and future earnings award of $554,514.50.

3. Past pain and suffering of $50,000 (less 33%);

4. Future pain and suffering of $50,000.00 (not discounted to present day value pursuant to United States v. Hiyashi, 282 F.2d 599, 606 (9th Cir. 1960)), (less 33%).

Plaintiff has not shown any support in law for his prayer for pre-judgment interest.

Each party is to bear his own costs. The Clerk of Court is to prepare a judgment in accordance with this.

SO ORDERED this __19__ day of February, 1999.

JOHN S. UNPINGCO
District Judge

10

0182

FILED
DISTRICT COURT OF GUAM

FEB 2 2 1999

MARY L.M. MORAN
CLERK OF COURT

## DISTRICT COURT OF GUAM

### TERRITORY OF GUAM

| | |
|---|---|
| TCW SPECIAL CREDITS, et al., | CIVIL CASE NO. 96-00055 |
| Plaintiff, | |
| vs. | PARTIAL JUDGMENT |
| F/V CHLOE Z, et al., | |
| Defendants | |
| ROBERT MATOS, | |
| Plaintiff-in-Intervention | |
| vs. | |
| M/V CHLOE Z, et al., | |
| Defendants | |

RECEIVED
ARRIOLA, COWAN & ARRIOLA

FEB 2 2 1999

BY: _____ TIME: 12:05

D. Paul Vernier
McKEOWN VERNIE PRICE MAHER
Suite 808, GCIC Bldg.
414 West Soledad Avenue
Agana, Guam 96910

Craig Miller
Davis Wright Tremaine LLP
2600 Century Square
1501 Fourth Avenue
Seattle, WA 98101

Dwight F. Ritter
LAW OFFICE OF DWIGHT F. RITTER
170 Laurel Street
San Diego, CA 92101

George Butler, Esq
BUTLER & TELFORD BUTLER
137 Murray Blvd., Suite 203
Hagåtña, Guam 96910

LAW OFFICES OF CESAR CABOT, P.C.
Cesar A. Cabot
First Savings & Loan Bldg.
655 S. Marine Drive
Tamuning, Guam 96911

William L. Banning
Kurt Micklow
BOOTH BANNING LLP
402 West Broadway, Suite 50
San Diego, CA 92101

0183

1  G. Patrick Civille
   CHING BOERTZEL CIVILLE CALVO & TANG
2  Suite 400, GCIC Bldg.
   414 West Soledad Avenue
3  Agana, Guam 96910

4  Anita P. Arriola
   ARRIOLA COWAN & ARRIOLA
5  P.O. Box X
   Agana, Guam 96910

   Steven Zamsky
   ZAMSKY LAW FIRM
   Suite 501, Bank of Guam Bldg.
   111 Chalan Santo Papa
   Agana, Guam 96910

   Michael A. Barcott
   HOLMES WEDDLE & BARCOTT
   999 Third Avenue, Suite 2600
   Seattle, WA 98104

6

7       This action came before the Court for a court trial. The issues have been tried and a

8  decision has been rendered.

9       IT IS ORDERED AND ADJUDGED that judgment is entered accordance with the Order

10  filed February 19, 1999.

11      Dated at Agana, Guam, this 22nd day of February, 1999.

12                           MARY L. M. MORAN
                             Clerk of Court
13
                             *Rosita P. San Nicolas* (signature)
14                      By:  Rosita P. San Nicolas
                             Chief Deputy Clerk
15

16

17

18

19

20
                     Notice is hereby given that this document was
21                   entered on the docket on 2/22/99
                     No separate notice of entry on the docket will
22                   be issued by this Court.
                             Mary L. M. Moran
23                   Clerk, District Court of Guam
24                   By: *San Nicolas* (signature)   2/22/99
                         Deputy Clerk          Date
25

26

27

28

0184

FILED
DISTRICT COURT OF GUAM

JAN 11 1999

MARY L.M. MORAN
CLERK OF COURT

BY: _____ Time: 2:28

## DISTRICT COURT OF GUAM
## TERRITORY OF GUAM

| | |
|---|---|
| TCW SPECIAL CREDITS, et al., | |
|     Plaintiffs, | Civil Case No. 96-00055 |
|     vs. | |
| F/V CHLOE Z, et al., | |
|     Defendants, | |
| _____ | |
| SLOBODAN PRANJIC, | |
|     Plaintiff-in-Intervention, | |
|     vs. | |
| M/V CHLOE Z, et al., | ORDER |
|     Defendants. | |

This case came on for trial on July 27, 1998. At the conclusion of the trial, the Court took the matter under advisement, and thereafter reviewed the trial testimony which was submitted by way of videotape deposition or transcript deposition. The Findings of Fact and Conclusions of Law follow.

**Findings of Fact:**

Slobodan Pranjic was born in Zadar in the Croatian/Bosnian area in 1955, and raised on the Adriatic Sea in Kali, Croatia by his grandfather. He grew up fishing, and after mandatory military service he returned to fishing. He was eventually recruited to fish in the Zuanich fleet by

1

EXHIBIT 2

Exhibit 9

Case 1:96-cv-00055    Document 1602    Filed 01/16/2007    Page 20 of 31

1  fellow Croatian Gobin as a crew member on board the M/V Chloe Z in 1991, earning $5.50 per
2  ton of tuna.

3    The Zuanich family owned several tuna purse seiners which fished in the western Pacific
4  Ocean, and transshipped the tuna through Guam. While out fishing in the western Pacific, tuna
5  vessels from the Zuanich fleet tied up normally two to three times per fishing trip.

6    On November 25, 1991, while working in the South Pacific in that capacity, the Chloe Z
7  made arrangements to tie up with the Milagros Z, another of the Zuanich fleet tuna purse
8  seiners. The Chloe Z was in need of certain supplies that the Milagros Z had, such as fuel and
9  fresh food. The two boats tied up sometime between six and seven pm. Typically, when the
10 boats tie up, all of the crew from both boats come up on deck to socialize. However, plaintiff
11 Pranjic was on duty, working with the net rings that attach to the nets. Pranjic was asked to go
12 to the engine room to get more rings that attach to the bottom of tuna nets. Pranjic then went to
13 the "wet-deck" area with crewmember Blaslov and Chief Engineer Matos; the net rings needed
14 to be welded in the wet-deck area. However, after welding so many rings, many more rings
15 needed repair, and further welding would create unwanted fumes. Chief Engineer Matos told
16 Pranjic to just go over to the Milagros to get more rings. Pranjic then ascended to the deck to
17 cross over to the Milagros Z. Once on deck, he stopped to talk to crewmember Vidov, who
18 was working on the re-fueling process.

19    It was testified that on the ocean that day, there was a "slight" roll, which witnesses
20 testified was no more than two feet, and the light was very good. It was not dark yet.

21    While on deck talking to Vidov, Pranjic witnessed Captain Gobin and crewmember
22 Kurtin cross over between the two boats by jumping from one boat to the other. After talking
23 to Vidov for approximately five minutes, Pranjic then proceeded to carry out the order he had
24 received from Chief Engineer Matos and he jumped from the Chloe Z to the Milagros Z. Before
25 he jumped he had estimated the distance at one meter to four feet apart.

26    His jump failed and he fell into the ocean between the vessels with "big heat" in his left

27
28                                          2

0193

1    ankle. On the way down he tried to grab a davit on the Milagros Z, but he could not hold on.

2    He knew something was dangerously wrong as he flailed in the ocean  He was able to glance at

3    his leg and saw that his foot and the ankle bone above it were bent to a 90 degree angle to his

4    shin.  No one saw him fall and no one knows how the ankle broke so severely and ended up at

5    such an angle.

6          Several crewmembers saw him fall and started to call out to him.  Moments later, the

7    captain and crewmembers jumped into the water to help him.  Pranjic thought that his leg might

8    fall off, so he told them to hold his leg on.  It apparently took 12 men to get him out of the

9    water.  He was carried out of the water and placed on deck, where the Captain told them to put

10   him in a berth.  While being placed in his berth, Pranjic heard his captain tell someone to pull up

11   the bumpers and that he should never have tied up to another vessel without putting out the

12   gangplank.

13         Pranjic was in excruciating pain in his berth when Lipanovich came in with an inflatable

14   cast.  He straightened out .   Pranjic's leg and put it in the cast.  A fleet helicopter was hailed to

15   pick up Pranjic, and he was taken by helicopter to Manas Island, a tiny island off New Guinea,

16   at which point the Zuanich fleet jet arrived on Manas and picked up Pranjic to fly him directly to

17   Guam.

18         On Guam, he was transported directly to Guam Memorial Hospital where he was

19   admitted.  He was diagnosed with a comminuted fracture of the left leg.  Many pieces were

20   shattered from the end of the tibia and the fibula was shattered and broken off.  The next

21   morning he was seen by an orthopedist, Dr. Bollinger, who immediately performed surgery

22   including irrigation and debridement.  Dr. Bollinger testified that the injury presented a 5% risk

23   that he would lose the limb.  He was subsequently hospitalized for 45 days, with two more

24   surgeries following the first.  He was released a couple of days before Christmas, but his wound

25   remained open and he ended up in critical condition again because of an allergic reaction to

26   some medication.  He had his third surgery at this time, when the doctor found granulation at

27

28                                        3

1   the original injury site. As of Dr. Bollinger's last visit with Pranjic, he had a 25% chance of

2   developing osteomylitus. He would never regain the full range of motion in the limb.

3       Pranjic ended up rehabilitating for the next three months. By March, a representative of

4   the Big Z Fishing Company contacted Pranjic and told him that he either had to go home or fish,

5   and that he could go out on the next fishing trip on the Big Z on their next trip to Samoa.

6   Pranjic testified he did not wish to return to Croatia because of the war there; he testified that

7   "war means no hospital and no medication." So Pranjic traveled to Samoa to board the Big Z,

8   but upon arrival his leg was still so weak that he could not even board the boat under his own

9   power. He needed help to walk on board the vessel, so Lipanovich told him that he simply

10  could not go fishing. Blaslov told him to return to the doctor. Not permitted to board, he

11  returned to San Diego, where he saw two more doctors.

12      One of these doctors was Dr. Ridgley, who told him that eventually, he would have to

13  have the ankle bone fused with the foot bone, but that that was not necessary right away. Dr.

14  Ridgley also testified that the severity of the break was consistent not with a mere bend, or a

15  smashing of the leg against the side of the vessel, but was consistent with a scenario where the

16  ankle was actually trapped against something, or caught inside something, such as a railing as

17  Pranjic fell to the ocean below. The break was not a twist, or the snap of a twig. The limb was

18  crushed, consistent with a scenario where the limb is caught under something as the full weight

19  of the rest of his body pulled against it as he fell. However, it was established at trial that no one

20  knows how the comminuted fracture occurred.

21      Dr. Ridgley performed more surgery, including surgical treatment of severe traumatic

22  arthritis, and cleaning out calcification and bone chips in the ankle. Pranjic was then medically

23  followed by Ridgley and a physical therapist for the next 18 months, when he was said to have

24  reached a "permanent stationary condition" of his left foot. He has endured a total of five

25  operations on the leg.

26      He still limped at the time of trial and is unable to play sports. He has worked in San

27

28

    4

0195

1  Diego under a work permit as a Bosnian refugee, but that status is likely to expire soon with
2  changes in the relationship between the U.S. government and the Bosnian government. His job
3  is as a helper at a sandwich restaurant in San Diego, where he performs general duties. The
4  bottom part of his left foot below his knee is disfigured and his left leg is shorter than his right,
5  necessitating a riser in his left shoe. He maintains an active lifestyle, and engages in swimming
6  and cycling, but he can no longer play soccer or other sports he used to play which require a
7  strong left leg and balance.

8      A video tape presented at trial, which was procured surreptitiously by private detectives
9  of defendant, shows Pranjic at work and walking to and from his car, and indicates that his
10  ambulation does not suffer except for the slightest limp, though he complains of significant pain
11  and increased exhaustion in the left leg.

12

13  **Conclusions of Law:**

14      The Court finds that the plaintiff has established a lien against the vessel Chloe Z
15  pursuant to the general maritime laws of the United States and pursuant to Supplemental Rules
16  for Certain Admiralty and Maritime Claims C & E, and Rule 9(h) of the Federal Rules of Civil
17  Procedure and for a preferred maritime lien under 46 U.S.C. §31301(5)(B).

18      As to the unseaworthiness cause of action, the plaintiff has the burden of proving the
19  following by a preponderance of the evidence: (1) the Chloe Z was unseaworthy, and (2) the
20  unseaworthy condition was a proximate cause of an injury to the plaintiff. As to the definition of
21  unseaworthiness: A vessel owner has a duty to provide and maintain a seaworthy vessel. A
22  vessel is seaworthy if the vessel and all of its parts and equipment are reasonable for their
23  intended purpose, and it is operated by a crew reasonably adequate and competent for the work
24  assigned. A vessel is unseaworthy if the vessel, or any of its parts or equipment, is not
25  reasonably fit for its intended purpose or if its crew is not reasonably adequate or competent to
26  perform the work assigned. Unseaworthiness is a proximate cause of injury or damage if it
27

28                                          5

1    played a substantial part in bringing about injury or damage.

2       If supported by the facts, the principles of contributory negligence would apply to this

3    case. Title 45 U.S.C. §53 provides that if the plaintiff was contributorly negligent, any award

4    may be reduced by the percentage of plaintiff's negligence. If the defendant raises the

5    affirmative defense of plaintiff's negligence, the defendant has the burden of proving each of the

6    following by a preponderance of the evidence: (1) the plaintiff was negligent, and (1) the

7    plaintiff's negligence was a proximate cause of the plaintiff's own injury.

8       A vessel's unseaworthy condition may arise from any number of circumstances, including

9    insufficient number of men assigned to perform shipboard tasks, or the existence of a defective

10    condition, however temporary, on a physical part of the ship. Ribitzki v. Canmar Reading &

11    Bates, Ltd. Partnership, 111 F.3d 658 (9ᵗʰ Cir. 1997). The issue is whether the ship was in an

12    unseaworthy condition as it was tied up to the Milagros Z without the gangplank for crew to

13    pass between, or without instructions to use the skiff to pass between the vessels. As to the

14    proper way to cross between two vessels that are tied up to each other, there was testimony that

15    there were two alternatives, one being putting a gangplank between the vessels and the other

16    being taking a skiff between the vessels.

17       Conditions existing on a vessel can render that vessel unseaworthy. Safety Expert

18    Unterberg testified that though stepping between tied-up tuna vessels is often done in the fishing

19    industry, it is not safe. At the calmest of seas, there is a two to three foot swell. Also, if the

20    ships are in different loading conditions the ships will be at different heights in the water.

21    Further, there is always sea spray in the ocean, even in calm seas, which makes every surface

22    slippery. There was a gangplank on board which was not used. In Expert Unterberg's opinion

23    the use of a gangplank can also be quite dangerous because one can be thrown off the gangplank

24    in rough seas. Expert Unterberg testified that the safest way to cross between vessels was to

25    use a skiff between the vessels. However, Expert Unterberg concluded that a gangplank was

26    safer than nothing, a fact that Chloe Z's Captain Gobin apparently agreed with, judging from his

27

28                          6

1    comment that he would never attempt or allow a crossing without a gangplank again.

2         Defense counsel argued that the unsound decision not to put up the gangplank was a

3    wrong judgment call but it is not unseaworthiness. Human mistake is not unseaworthiness. The

4    Court disagrees. A configuration on a ship that results in an unsafe condition is unseaworthy.

5    Further, the fact that the vessel captain had just jumped from one ship to the other indicated that

6    it was the accepted way of crossing between the vessels. Plaintiff Pranjic was subject to the

7    authority of the captain. As the lowest paid crewmember, Pranjic is unlikely to have asked the

8    captain to bring out the gangplank for him to cross over, just minutes after the captain himself

9    had just jumped between the vessels. The Court will not penalize Pranjic for making an unwise

10   decision when his direct superior had just crossed in the same manner and then admitted after

11   the accident that it shouldn't have been done that way. Further, Pranjic was carrying out an

12   order given him by his superior, the Chief Engineer Matos. Matos confirmed that he ordered

13   Pranjic to go to the Milagros Z, but that he was not on deck and he assumed the gangplank was

14   out and that Pranjic would cross using the gangplank. Common sense dictates that Pranjic was

15   obeying Matos' orders by going to the Milagros Z, and when he saw Captain Gobin cross by

16   jumping, it was tacit approval to cross in this manner. For these reasons, the Court finds no

17   contributory negligence on Pranjic's part.

18        In fact, Fish Captain Lipanovich testified that only the fish captain can issue the order to

19   bring out the gangplank. Both Captain Gobin and crewmember Slobodan Vidov testified that

20   after Pranjic's accident, every time the Chloe Z tied up to another vessel, the gangplank was

21   immediately put out. Captain Gobin testified that if the weather is bad, the skiff is used, and if

22   the weather is good, the gangplank is used. It is no longer permitted to jump between vessels.

23   For these reasons, the court finds unseaworthiness.

24        As to damages, defendant presented testimony that since the Zuanich fleet has reduced

25   its tuna fishing operations out of San Diego, there are vastly fewer Croatians employed in the

26   fishing industry. Defense Expert Thrush testified that 11 Zuanich vessels employed 224

27

28                                              7

0198

1  Croatians in past years, now he only has evidence of 18 Croatians presently employed in the

2  tuna fishing industry in 1997 and 1998. The Court rejects this as a basis for discrediting Expert

3  Wallace's testimony, as the Thrush testimony did not take into account the tuna fishing industry

4  from all over the world. The basis of Thrush's testimony was that in San Diego, fewer ships

5  employ Croatians. However, does the worldwide tuna industry also have no jobs for trained

6  crewmembers of tuna purse seiners, Croatian or not? The Court cannot presume that the

7  displaced Croatian tuna crewmembers are unemployable on a worldwide scale.

8        The Court declines to reduce any award by the amount of potential taxes for the reasons

9  stated in companion case, <u>Vjeko Mazic v. M/V Chloe Z</u>.

10        As of the date of trial, Pranjic had sustained medical expenses of $43,951.92.

11        The Court finds that Pranjic is entitled to:

12  1. Medical and incidental expenses in the amount of $43,951.92, as testified to by plaintiff's

13  economist Wallace and unrefuted by defendants;

14  2. Lost present and future earnings of $433,469.00 (using the average tonnage rather than the

15  top 50% tonnage) as testified to by Expert Wallace and as shown on Exhibit 19 of the joint trial

16  exhibits.

17  3. Past pain and suffering of $50,000;

18  4. Future pain and suffering of $50,000.00 (as a non-pecuniary loss, this is not discounted to

19  present day value pursuant to <u>United States v. Hiyashi</u>, 282 F.2d 599, 506 (9th Cir. 1960)).

20        Plaintiff has not shown any support in law for his prayer for pre-judgment interest.

21        Each party is to bear his own costs. The Clerk of Court is to prepare a judgment in

22  accordance with this.

23        SO ORDERED this 11th day of January, 1999.

24  Notice is hereby given that this document was
25  entered on the docket on 1/11/99
    No separate notice of entry on the docket will
26  be issued by this Court.
        Mary L. M. Moran
27    Clerk, District Court of Guam

28                                               JOHN S. UNPINGCO
                                                 District Judge
        Deputy Clerk      Date

8

# DISTRICT COURT OF GUAM

## TERRITORY OF GUAM

| | |
|---|---|
| TCW SPECIAL CREDITS, et al<br>Plaintiffs, | CIVIL CASE NC. 96-00055 |
| vs. | |
| F/V CHLOE Z, et al,<br>Defendants | |
| SLOBODAN PRANJIC,<br>Plaintiff-in-Intervention | PARTIAL JUDGMENT |
| vs. | |
| M/V CHLOE Z, et al<br>Defendants | |

D. Paul Vernier
McKEOWN VERNIER PRICE MAHER
Suite 808, GCIC Bldg.
414 West Soledad Avenue
Agana, Guam 96910

G. Patrick Civille
CHING BOERTZEL CIVILLE CALVO & TANG
Suite 400, GCIC Bldg.
414 West Soledad Avenue
Agana, Guam 96910

George Butler
BUTLER & TELFORD BUTLER
Suite 203, American Life Bldg.
137 Murray Blvd.
Agana, Guam 96910

Anita P. Arriola
ARRIOLA, COWAN & ARRIOLA
P.O. Box X
Agana, Guam 96932

Bill R. Mann
BERMAN O'CONNOR & MANN
Suite 503, Bank of Guam Bldg.
111 Chalan Santo Papa
Agana, Guam 96910

Cesar Cabot
Law Offices of Cesar C. Cabot
Suite 102, First Savings & Loan Bldg
655 S. Marine Drive
Tamuning, Guam 96911

Steven Zamsky
Zamsky Law Firm
Suite 501, Bank of Guam Bldg.
111 Chalan Santo Papa
Agana, Guam 96910

Lawrence J. Teker
GAYLE & TEKER
Suite 200, Gayle & Teker Bldg.
330 Hernan Cortez Avenue
Agana, Guam 96910

. . . . . . . .

. . . . . . . .

0200

Judgment is hereby entered in accordance with the Order filed on January 11, 1999.

Dated at Agana, Guam, this 11ᵗʰ day of January, 1999.

MARY L.M. MORAN
Clerk of Court

By:  Rosita P. San Nicolas
Chief Deputy Clerk

Notice is hereby given that this document was
entered on the docket on ___1/11/99___.
No separate notice of entry on the docket will
be issued by this court.

Clerk, District Court of Guam

By _____  1/11/99
Deputy Clerk          Date

0201

RECEIVED
ARRIOLA, COWAN & ARRIOLA

OCT 3 0 2000

BY: _____ TIME: 11:43

F I L E D
DISTRICT COURT OF GUAM

OCT 2 5 2000

MARY L.M. MORAN
CLERK OF COURT

12.22

DISTRICT COURT OF GUAM

TERRITORY OF GUAM

TCW SPECIAL CREDITS, et al.,

    Plaintiffs,

    vs.

F/V CHLOE Z, et al.,

    Defendants.

Civil Case No. 96-00055

SLOBODAN PRANJIC,

    Plaintiff-in-Intervention,

    vs.

M/V CHLOE Z, et al.,

    Defendants.

ORDER

This case is before the Court on the Mandate of the Ninth Circuit affirming in part and reversing in part the partial judgment of this Court. Furthermore, the Ninth Circuit Court of Appeals remanded for a fact-finding hearing the issue of whether the Chloe Z should be equitably estopped from raising a statute of limitations defense. Consistent with the terms of the Mandate,

IT IS HEREBY ORDERED that the January 11, 1999 partial judgment be AMENDED to strike the $43,951.92 award of past medical expenses to Plaintiff Pranjic.

IT IS FURTHER ORDERED that the parties shall appear before the Court on Friday,

EXHIBIT ____3____

Exhibit 12

Exhibit 12

1    November 3, 2000 at 11:00 a.m. for a Status Hearing to discuss the issue on remand and the

2    need, if any, for further discovery on this issue.

3       IT IS SO ORDERED.

4       Dated: October _25_, 2000.

5

6                             JOHN S. UNPINGCO
                                District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

**Unpublished Disposition**
NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA9 Rule 36-3 for rules regarding the citation of unpublished opinions.)

Appeal from the United States District Court for the District of Guam John S. Unpingco, District Judge, Presiding.

## MEMORANDUM [FN1]

FN1. This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as may be provided by Ninth Circuit Rule 36-3.

**\*1** The fishing vessel CHLOE Z appeals (1) the district court's denial of its motion to dismiss seaman Robert Matos's claims as res judicata by application of Federal Rule of Civil Procedure 41(a)(1)'s "two dismissal" rule to two prior dismissals and (2) the court's decision to apply the doctrine of **equitable estoppel** to preclude the CHLOE Z from raising a statute of limitations defense. Matos cross-appeals (1) the district court's refusal to apply the doctrine of collateral estoppel to issues decided in the earlier *in personam* action against the vessel's owner, (2) the court's finding that Matos was 33% contributorily negligent for his injuries, (3) the court's calculation of future earnings, and (4) the court's denial of prejudgment interest. We have jurisdiction under 28 U.S.C. § 1292(a)(3), and we affirm in part, reverse in part, and remand for further proceedings. [FN2]

FN2. This appeal and related appeals arise from many years of litigation involving the CHLOE Z. Judge Unpingco is to be complimented not only for the substantial time he committed to resolution of the numerous claims in this and the related actions, but also for his careful legal analysis and well-documented record. Likewise, we appreciate the quality briefing provided by all counsel on appeal.

We affirm the district court's res judicata ruling. Matos's second dismissal was in a California state court, a court in which Rule 41(a)(1)(i) did not apply. *See Rader v. Baltimore & O.R. Co.,* 108 F.2d 980, 986 (7th Cir.), *cert. denied,* 309 U.S. 682 (1940); *see also* 9 Wright & Miller, Federal Practice & Procedure § 2368, at 330 (1995). And, California courts do not have a civil equivalent to Rule 41(a)(1)(i). *See Manning v. South Carolina Dep't of Hwy. and Pub. Transp.,* 914 F.2d 44, 47 n. 5 (4th Cir.1990). Consequently, neither of Matos's two prior dismissals were dismissals "with prejudice," thus the district court was correct in declining to apply the doctrine of res judicata to bar this action.

We reverse the district court's **equitable estoppel** ruling and remand for further proceedings as to that issue. On the CHLOE Z's motion to dismiss and vacate *in rem* process under Supplemental Admiralty Rule E(4)(f), the court ruled conclusively that the vessel was equitably estopped from arguing that Matos's *in rem* claims were barred by the applicable 3-year statute of limitations for **maritime** torts. In so doing, the court improperly resolved disputed issues of material fact, including whether the CHLOE Z in fact made any representations that the *in personam* judgment would be satisfied under the insurance policy, to what extent the seamen relied to their detriment upon the alleged representations, and whether such reliance caused the statute of limitations to lapse on Matos's *in rem* claims against the vessel. We remand on this issue for a fact-finding hearing to permit the court an opportunity to make the factual determinations necessary to decide whether the CHLOE Z should be equitably estopped from raising a

http: web2.westlaw comresulUtext wl?RP=/search/default.wl&RS=WLW2 86&VR=2 0&SV=Split&FN= top&MT=Westlaw&CFID=0&DB=CTA9&DocSample=Fsl

Page 1 of 2

Exhibit 10

**EXHIBIT** **4**

000063

Case 1:96-cv-00055    Document 1602-2    Filed 01/16/2007    Page 1 of 13

ate of limitations defense. We leave to the district court's discretion any decisions regarding additional discovery this issue.

ming to the issues raised in Matos's cross-appeal, we affirm the district court's refusal to apply the doctrine of lateral estoppel to issues decided in the earlier *in personam* action against the vessel's owner. Assuming without ding that collateral estoppel was available as a matter of law, we hold that the district court did not, given the cedural differences between the two proceedings and the concerns raised by other lien claimants in this forfeiture on, abuse its discretion in declining to apply it. See *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 331 79); *see also Town of N. Bonneville v. Callaway*, 10 F.3d 1505, 1508 (9th Cir.1993).

We affirm the district court's conclusion that Matos was 33% contributorily negligent for his injuries. Indeed, CHLOE Z's expert opined that Matos was 100% at fault because he attempted to lift the strainer too aggressively thout trying to loosen it first. The court's decision to assign some responsibility for the accident to Matos was not, sed on the evidence presented at the *in rem* trial, clear error. See *Havens v. F/T Polar Mist*, 996 F.2d 215, 217 h Cir.1993).

e also affirm the district court's conclusion to calculate lost future earnings based on nine months of work per year opposed to eleven months of work per year. Based on this record, it was not clear error for the court to conclude at Matos would not have averaged more than nine months of work per year. [FN3]

> FN3. We also reject the CHLOE Z's argument that the district court miscalculated Matos's past and future lost wages. Based on the record supplied by the CHLOE Z, the district court did not err by deducting an
>
> additional 2/12, or 16.67%, to reflect lost wages based on a nine month work year.

nally, we reverse the denial of prejudgment interest. "In admiralty, prejudgment interest must be granted unless eculiar circumstances justify its denial." *Vance v. American Hawaii Cruises, Inc.*, 789 F.2d 790, 794 9th Cir.1986) (quoting *Dillingham Shipyard v. Associated Insulation Co.*, 649 F.2d 1322, 1328 (9th Cir.1981)). ecause the court did not articulate any reason for denying prejudgment interest, we remand under *Vance* for a etermination whether special circumstances justify the denial.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS. FN4] Each party to pay its own costs on appeal.

> FN4. Matos's motion for judicial notice is denied.

C.A.9 (Guam),2000. ICW Special Credits v. FISHING VESSEL CHLOE Z 238 F.3d 431 (Table), 2000 WL 1277935 (9th Cir.(Guam)), Unpublished Disposition END OF DOCUMENT

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

web2.westlaw.com/result/text.wl?RP=/search/default.wl&RS=WLW2.86&VR=2.0&SV=Split&FN=_top&MT=Westlaw&CFID=0&DB=CTA9&DocSample=Fal ...

000064   Page 2 of 2

Case 1:96-cv-00055    Document 1602-2    Filed 01/16/2007    Page 2 of 13

**Unpublished Disposition**
**NOTICE: THIS IS AN UNPUBLISHED OPINION.**

The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA9 Rule 36-3 for rules regarding the citation of unpublished opinions.)

Appeal from the United States District Court for the District of Guam John S. Unpingco, District Judge, Presiding.

## MEMORANDUM [FN1]

FN1. This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as may be provided by Ninth Circuit Rule 36-3.

**\*\*1** The fishing vessel CHLOE Z appeals (1) the district court's denial of its motion to dismiss seaman Slobodan Pranjic's claims as res judicata pursuant to Federal Rule of Civil Procedure 41(a)(1)(i)'s "two dismissal" rule, (2) the court's decision to apply the doctrine of **equitable estoppel** to preclude the CHLOE Z from raising a statute of limitations defense, (3) the court's decision not to reduce Pranjic's future lost wages to account for applicable Croatian income taxes, and (4) the court's award of $43,951.92 in past medical expenses. We have jurisdiction under 28 U .S.C. § 1292(a)(3), and we affirm in part, reverse in part, and remand for further proceedings. [FN2]

FN2. This appeal and related appeals arise from many years of litigation involving the CHLOE Z. Judge Unpingco is to be complimented not only for the substantial time he committed to resolution of the numerous claims in this and the related actions, but also for his careful legal analysis and well-documented record. Likewise, we appreciate the quality briefing provided by all counsel on appeal.

Pranjic filed and voluntarily dismissed three prior actions, the first in the district court for the Southern District of California, the second in a California state court, and the third in a Hawaii state court. To begin, we reject the CHLOE Z's contention that the latter two dismissals were adjudications upon the merits under Rule 41(a)(1)(i) for the reason that *Federal* Rule of Civil Procedure 41(a)(1)(i) does not govern voluntary dismissals in *state* courts. We recognize, however, that unlike California, Hawaii has adopted a rule nearly identical to Federal Rule 41(a)(1)(i). *See* Haw. R. Civ. P. 41(a)(1)(A). [FN3] Therefore the question is whether Pranjic's third dismissal was an adjudication upon the merits under Hawaii Rule of Civil Procedure 41(a)(1)(A). *See Manning v. South Carolina Dep't of Hwy. and Pub. Transp., 914 F.2d 44, 47 n. 5 (4th Cir.1990).*

FN3. Hawaii Rule 41(a)'s "two dismissal" rule was not modified by the recent amendments to Hawaii's civil rules, which were effective January 1, 2000.

interpreting Hawaii's "two dismissal" rule, we look to our own construction of the parallel Federal Rule for guidance, *Kawamata Farms, Inc. v. United Agri Prods.*, 86 Hawai'i 214, 948 P.2d 1055, 1096 (Haw.1997),

hp://web2.westlaw.com/result/text.wl?RP=/search/default.wl&RS=WLW2.86&VR=2.0&SV=Split&FN=_top&MT=Westlaw&CFID=0&DB=CTA9&DocSample=Fal ...

Page 1 of 2

Exhibit 11

**EXHIBIT 5**

000024

Case 1:96-cv-00055    Document 1602-2    Filed 01/10/2007    Page 3 of 13

eping in mind that we have no definitive interpretation from Hawaii and that "[t]he basic purpose of the Federal ules is to administer justice through fair trials, not through summary dismissals as necessary as they may be on casion." *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 373, 86 S.Ct. 845, 15 L.Ed.2d 807 (1966).

luntary dismissals under *Fed.R.Civ.P. 41(a)(1)* are normally without prejudice except that a dismissal by notice der 41(a)(1)(i) "operates as an adjudication upon the merits when filed by a plaintiff who has once dismissed in y court of the United States or of any state an action based on or including the same claim." *Fed.R.Civ.P.* (a)(1)(i). In *Lake at Las Vegas Investors Group, Inc. v. Pacific Malibu Dev. Corp.*, 933 F.2d 724 (9th Cir.1991), wever, we noted that some courts have declined to strictly apply the rule when the parties consented to one of the ior dismissals or where the dismissal was not unilateral. *Id.* at 727 (discussing *Poloron Prod., Inc. v. Lybrand ss Bros. & Montgomery*, 534 F.2d 1012, 1017-18 (2d Cir.1976)). The Second Circuit in *Poloron*, for example, asoned that in such situations where the purpose of the rule--to avoid harassing the defendant--would not be rved, courts should be "most careful not to construe or apply the [rule] too broadly." *Poloron*, 534 F.2d at 1017. *2 Based on the circumstances here, strict application of the two dismissal rule is not warranted. For example, the ecord indicates that the Hawaii dismissal was preceded by discussions between the parties about litigating the ction in Guam. Counsel for the CHLOE Z stated in correspondence: "If you will agree to dismiss the currently ending actions [in California and Hawaii] and refile them in a court in Guam, we will consider arranging for epositions to be taken in Guam[.]" Counsel for Pranjic confirmed that the Hawaii case would be "withdraw[n]" nd refiled in Guam. Although the Hawaii dismissal was not formally "stipulated," it was not unilateral as all parties acitly agreed to the dismissal in favor of litigating the action in Guam. Also, there is no evidence that the filings and dismissals were part of a strategy to harass the CHLOE Z. Accordingly, we affirm the district court's decision not to dismiss Pranjic's action on res judicata grounds.

We reverse the district court's **equitable estoppel** ruling and remand for further proceedings as to that issue. On the CHLOE Z's motion to dismiss and vacate *in rem* process under Supplemental Admiralty Rule E(4)(f), the court ruled conclusively that the vessel was equitably estopped from arguing that Pranjic's *in rem* claims were barred by the applicable 3-year statute of limitations for **maritime** torts. In so doing, the court improperly resolved disputed issues of material fact, including whether the CHLOE Z in fact made any representations that the *in personam* dgment would be satisfied under the insurance policy, to what extent Pranjic relied to his detriment upon the leged representations, and whether such reliance caused the statute of limitations to lapse on Pranjic's *in rem* claims against the vessel. We remand on this issue for a fact-finding hearing to permit the court an opportunity to make the factual determinations necessary to decide whether the CHLOE Z should be equitably estopped from raising a statute of limitations defense. We leave to the district court's discretion any decisions regarding additional discovery on this issue.

As for the CHLOE Z's argument that the court erred in not reducing Pranjic's lost wages to account for applicable Croatian income taxes, we affirm for the reasons set forth in the Memorandum Disposition filed in *Vjeko Mazic v. F/V CHLOE Z*, No. 99-15169 (filed concurrently with this disposition).

Finally, Pranjic concedes that the court erred in awarding $43,951.92 for past medical expenses. Accordingly, we reverse on this issue and direct the district court to amend the judgment accordingly on remand.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS. Each party to pay its own costs on appeal.

C.A.9 (Guam),2000.

TCW Special Credits v. FISHING VESSEL CHLOE Z

238 F.3d 431 (Table), 2000 WL 1277922 (9th Cir.(Guam)), Unpublished Disposition

END OF DOCUMENT

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

RECEIVED

APR 12 2004

BUTLER & TELFORD BUTLER

FILED
DISTRICT COURT OF GUAM

APR 08 2004

MARY L. M. MORAN
CLERK OF COURT

# DISTRICT COURT OF GUAM

## TERRITORY OF GUAM

| | |
|---|---|
| TCW SPECIAL CREDITS, et al., | Civil Case No. 96-00055 |
| Plaintiffs, | |
| vs. | |
| F/V CHLOE Z, et al., | |
| Defendants. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| ROBERT MATOS AND SLOBODAN PRANJIC, | |
| Plaintiffs-in-Intervention, | |
| vs. | |
| M/V CHLOE Z, et al., | |
| Defendants. | |

This matter came before the Court for an evidentiary hearing on the 20th and 21st day of May 2003.[1] The Plaintiffs-In-Intervention, Robert Matos and Slobodan Pranjic, ("Matos and Pranjic") were represented by Dwight F. Ritter, Esq and George Butler, Esq. The defendant, M/V Chloe Z ("Chloe Z") was represented by Michael A. Barcott, Esq. and Anita Arriola, Esq. The issues tried before the Court were: 1) whether the Chloe Z should be equitably estopped from raising a statute

---

[1] These cases were tried in July 1998 on Plaintiffs-in-Intervention, Robert Matos and Slobldan Pranjic's complaints *in rem* for personal injuries brought against the F/V Chloe Z. This Court rendered decisions in favor of Matos and Pranjic. Chole Z appealed the decisions. Thereafter, the Ninth Circuit reversed the decisions and remanded the matters to this Court to rule on two specific issues as discussed herein.

COPY

1    of limitations defense, and 2) whether special circumstances exist that would justify denial of

2    prejudgment interest to plaintiff, Mr. Matos.

3          THE COURT, having considered the evidence, oral and documentary, and the stipulations

4    of the parties, hereby issues the following findings of fact and conclusions of law pursuant to Rule

5    52(a) of the Federal Rules of Civil Procedure.[2]

6                                    **FINDINGS OF FACT**

7          1.     The plaintiffs-in-intervention[3], Pranjic and Matos were seamen who suffered

8    personal injuries on the fishing vessel Chloe Z. Pranjic was injured in 1991 and Matos was injured

9    in 1992. Thereafter, they sought representation by the Law Offices of Dougherty & Hildre located

10   in San Diego, California.

11         2.     Trying to get jurisdiction over the defendant, the plaintiffs filed maritime claims for

12   personal injuries in both state and federal courts in California and in the State Court of Hawaii.

13   See Plaintiffs' Exhibits 1.1; 3, 4, 5, 7, 8, 10 and 11.

14         3.     The plaintiffs dismissed all previously filed lawsuits in other jurisdictions, and filed

15   their respective claims in Guam in 1994, Civil Case No. 94-00013 and Civil Case No. 94-000134.

16   See Plaintiffs-in-intervention Exhibits 11 and 12. The plaintiffs filed actions both *in rem* and *in*

17   *personam*. However, the plaintiffs never perfected their *in rem* cases by arresting the Chloe Z. In

18   fact the *in rem* claims were never pursued prior to trial.[4] In July 1996, the plaintiffs took their *in*

19   *personam* cases to trial. The cases were tried and each of the plaintiffs were awarded substantial

20   jury awards.

21         4.     However, before the plaintiffs could recover on their *in personam* judgments, the

22   Chloe Z effectively went out of business and there was no source of payment.

23

24         [2]To the extent that a finding of fact should be deemed a conclusion of law, or a conclusion of law deemed
25   a finding of fact, it shall so be considered.

26         [3]The plaintiffs-in-intervention, Pranjic and Matos, shall be referred to as plaintiffs herein.

27         [4]See Defendant's Exhibit Y, letter from Attorney Melançon to Attorney Dougherty, instructing Attorney
     Dougherty that because the defendant vessel Chloe Z was not served in the case, the *in rem* claims would have to
28   be dismissed. In addition the Court takes judicial notice of the Joint Pretrial Statement of All Parties filed in the
     Slobodan Pranjic Civil Case No. 94-00014, July 7, 1995, Docket No. 103, page 10, subsection (k) wherein it states
     "Claims against the vessel Chloe Z and .... are hereby dismissed." See also Defendant's Exhibit L, Joint Pretrial
     Statement of All Parties filed in the Robert Matos Civil Case No. 94-00013, July 3, 1995, page 12 , subsection (k)
     wherein it states "Claims against the vessel Chloe Z and .... are hereby dismissed." 1



1    5.    Realizing that there would be no recovery in the *in personam* cases, the plaintiffs

2    sought to intervene in the present *in rem* case in December 1996.

3    6.    Because the complaints in intervention were filed more than three years from the

4    date of the injuries, Chloe Z raised the statute of limitations as a defense. In response the plaintiffs

5    claimed that Chloe Z should be estopped from asserting that defense because of the defendant's

6    actions in the original claim. Specifically, they claim that defense counsel made representations

7    about insurance in the earlier actions which caused the plaintiffs to file their claims in the present

8    case in an untimely manner.

9    7.    The representation of which the plaintiffs complain concern one made early in the

10   litigations.

11   8.    When the cases were still in California, there was a mediation conference held

12   before Judge Greer attended by attorneys James McMullen ("Mr. McMullen") and Donald F.

13   Hildre ("Mr. Hildre"). When plaintiffs' counsel, Mr. Hildre became unhappy with the conference

14   discussions he threatened to arrest the vessel. There is conflicting testimony as to whether counsel

15   for Chloe Z, Mr. McMullen, asked Mr. Hildre to forego arresting the Chloe Z because there was

16   "plenty of insurance." *See* Donald F. Hildre, Esq. testimony; *see* also Deposition Testimony of

17   James McMullen, Esq., p.80:19 - p. 81:25, March 28, 2001.

18   9.    Although the plaintiffs claim that attorney McMullen made a representation

19   regarding insurance in the early stages of the litigation, no testimony or evidence was presented

20   concerning representations made by any other individuals which could have confused or mislead

21   the plaintiffs.

22   10.   The plaintiffs claim that the defendant misled the plaintiffs in their initial

23   disclosures. In the defendant's initial disclosure statement made January 30, 1995, the defendant

24   stated:

25          4.    Substance of any insurance agreement that may cover any

26          resulting judgment:

27                The owner has a protection and indemnity insurance
                  policy which covers Chloe Z Vessel and Z Fishing
28                Company, Inc. up to $25,000,000.00, subject to a

$7,500.00 deductible. The policy insures against
seaman injuries and covers the *typical protection
and indemnity risk.* Consistent with standard P&I
insurance policies, the subject policy would
indemnify the owners should they be found liable for
seamen injuries. (emphasis added).

See Joint Exhibit J1.

11.     The term "protection and indemnity" insurance in the initial disclosure was adequate to place plaintiffs' counsel on notice that this policy may be a "pay to be paid" policy. The prevalent maritime personal injury insurance policy is the protection and indemnity policy which is basically a "pay to be paid" policy. See testimony of expert witnesses Carlton Russell, Esq. and David Ledger, Esq.

12.     The policy is drafted to indemnify Chloe Z, not pay third parties. Under the terms of the policy Chloe Z would be reimbursed only after it paid the loss or expense. Absent payment by Chole Z to the plaintiffs there would be no recovery. See Declaration of Mark Jones, Defendant's Exhibit U.

13.     A policy containing such a condition precedent to recovery is typically referred to as "pay to be paid" policy. Id., See Testimony of expert witnesses Carlton Russell, Esq. and David Ledger, Esq.

14.     Based upon their experience in past cases, the plaintiffs' counsel understood that the insurance policy in force was a liability policy. In other words, plaintiffs believed the insurer would tender payment in satisfaction of any settlement reached or judgments rendered.

15.     On or about July 11, 1996, a few days before the *in personam* cases were scheduled to be tried the Court held a conference with counsel. See Joint Exhibit J3, Letter from Jean Melançon, to William Dougherty and testimony of David Ledger, Esq.

16.     At the conference, Attorney Ledger, counsel for the defendant, disclosed that Chloe Z Fishing Co., was in "dire financial straits." Counsel disclosed Chloe Z's financial situation to avoid being subsequently charged with misrepresentation. See Join Exhibit J2.

17.     Moreover, Mr. Ledger informed the parties and the Court that if the matter proceeded to trial, the insurer would enforce the "pay to be paid" provisions of the policy and there



1    could be problems with recovery. See Testimony of David Ledger.

2        18.    Prior to the conference, the plaintiffs were aware of Chloe Z's financial problems.

3    For example, in March 1996, plaintiffs counsel, Mr. William O. Dougherty wrote to Mr. Bernard

4    from Arnold & Arnold, the adjuster for Sphere Drake, expressing his concern about the lack of

5    payment for his client, Mr. Mazic's "maintenance and cure." He stated that in order to protect his

6    client's interests he may have to undertake action to seize the Chole Z. See Defendant's Exhibit

7    FF.

8        19.    One month later, in April 1996, Mr. Dougherty wrote to Mr. Melançon regarding

9    arrest of the vessel because Chloe Z had refused to pay the maintenance and cure of an injured

10    seaman. See Defendant's Exhibit BB.

11        20.    In fact, Mr. Dougherty's concerns were seemingly confirmed by co-counsel, Mr.

12    Jean Melançon. Mr. Jean Melançon states in his April 26, 1996 letter to Mr. Dougherty that "[t]he

13    various Z Fishing Companies appear to be in [a] tentative financial condition . . . This

14    circumstance leads to me to conclude that the owner of the CHLOE Z could also file for

15    bankruptcy." See Defendant's Exhibit CC.

16        21.    In June 1996, Mr. Melançon was told by attorney Ledger, that the Chole Z was

17    suffering financial difficulties and may file for bankruptcy protection. See Defendant's Exhibit Y.

18        22.    The Court finds that months prior to the *in personam* trial, the plaintiffs were on

19    notice regarding the defendant's financial difficulties and potential insolvency. Yet, despite such

20    knowledge the plaintiffs failed to take any steps to ensure there would be a source of recovery.

21        23.    At no time prior to the trial did the plaintiffs request to see the insurance policy to

22    confirm what they were being told and to ensure recovery from the defendant's insurer. The

23    defendant's initial disclosures simply did not tell enough about the insurance coverage such that

24    the plaintiffs should have relied upon it. Additionally, once there were questions regarding the

25    defendant's financial stability and insurance coverage it would have been prudent to seek the actual

26    policy to review.

27        24.    Nor, did the plaintiffs seek a Letter of Undertaking or a bond to further secure the

28    plaintiff's interests.


1   25.   It is the practice in the maritime industry to request Letters of Undertaking from

2   underwriters to avoid the detention of vessels and the expense of posting security in other forms.

3   See Testimony of Carlton Russell, Esq.  In such a letter, the underwriter will agree on the behalf

4   of its shipowner-assured to satisfy any judgment, usually up to a stipulated amount.

5   26.   Even though the plaintiffs should have been or were in fact well aware of the

6   defendant's financial difficulties and the potential problems with recovery given the insurer's

7   articulated position, they chose to only pursue their *in personam* cases.

8   27.   An *in rem* cause of action creates a lien against the vessel or against the proceeds

9   of any sale of the vessel to ensure that any judgment rendered would be satisfied.

10   28.   The only source of recovery to the plaintiffs would have been the arrest of the

11   vessel.

12   29.   On July 11, 1996, the plaintiffs could have sought to arrest the vessel.  Without

13   coupling the *in rem* cause of action with their *in personam* actions, there was no reasonable basis

14   for the plaintiffs to believe there would be recovery.

15                              **CONCLUSIONS OF LAW**

16   1.   The Court has jurisdiction over the subject matter herein and the parties hereto

17   pursuant to 28 U.S.C. §1332.

18   2.   The plaintiffs sought *in rem* judgments for personal injuries suffered on the fishing

19   vessel Chloe Z.

20   3.   Pursuant to 46 U.S.C. § 763a, an *in rem* action based on maritime tort is subject to

21   a three-year statute of limitations.

22   4.   As noted, the injuries sustained by the plaintiffs occurred in 1991 and 1996, yet they

23   did not seek to intervene in the *in rem* case until December 1996.  Admittedly, the three-year statute

24   of limitations had run, however, the plaintiffs claim that the defendant should be equitably estopped

25   from raising a statute of limitations defense.

26   5.   The burden to prove equitable estoppel is on the party claiming estoppel.  See Santa

27   Maria v. Pacific Bell, 202 F.3d 1170, 1177 (9th Cir. 1999).  Such proof must be by clear,

28   convincing, and satisfactory evidence.  Cedar Creek Oil and Gas Company v. Fidelity Gas



1    Company, 249 F.2d 277, 281 (9th Cir. 1957). Under Santa Maria, equitable estoppel requires the

2    plaintiffs to show:  1) a material misrepresentation, also known as a fraudulent concealment, 2)

3    reasonable reliance on the alleged representation, and 3) a causal link between the alleged

4    misrepresentation and the lapse of the statute of limitations. Id.  In this instance, the plaintiffs will

5    have to show that the defendant represented that the *in personam* judgment would be satisfied

6    under the insurance policy, that the plaintiffs reasonably relied on those alleged representations,

7    and that such reliance caused the statute of limitations to lapse on plaintiffs' *in rem* claims against

8    the vessel.

9        6.        In general there are two principal types of insurance for liability for personal injury

10   to others.   One type is liability insurance, which obligates an insurer to pay damages which the

11   insured is legally liable to pay.  The other type is indemnity insurance, which obligates the insurer

12   to indemnify or reimburse the insured to up to the extent that the insured himself has actually paid

13   damages. Appleman, *Insurance Law & Practice* (Buckley ed.), § 4261 (1979).

14       7.        "The chief difference between a liability policy and an indemnity policy is that under

15   the former a cause of action accrues when the liability attaches, while under the latter there is no

16   cause of action until the liability has been discharged, as by payment of the judgment by the

17   insured. That is, under an indemnity policy the insured must have suffered an actual money loss

18   before the insurer is liable." Id..

19       8.        It is clear to this Court that the Chloe Z purchased a marine policy of indemnity

20   rather than a liability policy.

21       9.        Based upon Attorney McMullen's alleged representation during a mediation

22   conference in 1994 regarding insurance, the plaintiffs' counsel agreed to forego arresting the vessel.

23   However reasonable the Court finds the decision to forego arresting the vehicle at that time, the

24   Court does not find the decision reasonable after counsel learned that the Chloe Z was suffering

25   financially. Moreover, counsel was told very clearly during the pretrial conference with Judge

26   Coughenour  that there would be no recovery by the underwriter until the owner of the vessel first

27   paid on the judgment.  Yet, instead of asking for the trial to be postponed in order to intervene in

28   the present *in rem* case or at least request a copy of the insurance policy to verify opposing

1    counsel's representations, counsel decided to go forward with the *in personam* trials.

2        10.    Unfortunately, the plaintiffs' counsels' failure to appreciate the nature of the

3    "indemnity" policy caused the plaintiffs to forego pursuing their *in rem* claims in the earlier

4    litigation. The Court does not find that there was any misrepresentation by the defendant which

5    rises to the level of a material or fraudulent misrepresentation. In fact, given the testimony of Mr.

6    Ledger, the Court finds that the plaintiffs were told exactly what they could expect from the

7    underwriters should they prevail at trial and the defendant become insolvent. The Court finds Mr.

8    Ledger's testimony credible. Moreover, Mr. Ledger's testimony is supported by opposing counsel,

9    Jean Melançon's letter of July 11, 1996 to co-counsel, Mr. Dougherty.

10        11.    The next issue concerns whether Matos should have been entitled to prejudgment

11    interest. However, the Court need not reach the resolution of this issue because it finds that the

12    plaintiffs' *in rem* causes of action are in fact time barred by the statute of limitations.

13        In accordance with the foregoing Findings of Fact and Conclusions of Law,

14        IT IS HEREBY ORDERED, ADJUDGED AND DECREED that upon consideration of the

15    evidence produced at trial that Judgment shall be entered in FAVOR of the Defendants.

16    Accordingly, the prior Judgments entered in favor of the plaintiffs are hereby VACATED. Each

17    party to bear its own costs and attorney's fees.

18        SO ORDERED this *8th* day of April, 2004.

19

20

21

22                         JOHN S. UNPINGCO
                     District Judge

23

24

25

26

27    Notice is hereby given that this document was
entered on the docket on _____ date _____

28    No separate notice of entry on the docket will
be issued by _____ _____ _____

FILED
DISTRICT COURT OF GUAM

APR 0 9 2004

MARY L. M. MORAN
CLERK OF COURT

# DISTRICT COURT OF GUAM

## TERRITORY OF GUAM

| | |
|---|---|
| TCW SPECIAL CREDITS, et al., | CIVIL CASE NO. 96-00055 |
| Plaintiffs, | |
| vs. | **J U D G M E N T** |
| F/V CHLOE Z, et al., | |
| Defendants. | |
| ROBERT MATOS and SLOBODAN PRANJIC, | |
| Plaintiffs-in-Intervention, | |
| vs. | |
| M/V CHLOE Z, et al., | |
| Defendants. | |

Judgment is hereby entered in accordance with the Findings of Fact and Conclusions of Law filed April 8, 2004.

Dated this 9th day of April, 2004, Hagatna, Guam.


MARY L. M. MORAN
Clerk of Court

By: _____
Deputy Clerk

Notice is hereby given that this order was
entered on the docket on . . .
. . .

RECEIVED

APR 1 2 2004

BUTLER & TELFORD BUTLER

EXHIBIT ___7___

COPY

FILED
DISTRICT COURT OF GUAM

OCT 23 1997

MARY L. M. MORAN
CLERK OF COURT

1
2
3
4
5
6
7
8

9          DISTRICT COURT OF GUAM

10           TERRITORY OF GUAM

11

12

13    TCW SPECIAL CREDITS, et al.,                    Case No. CV 96-00055

      Plaintiffs and Plaintiffs-in-Intervention,
14
                    vs.
15                                                           ORDER

16    F/V CHLOE Z, her engines, tackle,
      apparel, and furniture, et al.,
17
      Defendants.
18    _____

19          This matter is before the Court on Defendant Sphere Drake Underwriting Management,

20    Ltd.'s ("Sphere Drake") Motions to Dismiss[1].  Sphere Drake has moved to dismiss both Plaintiff

21    Slobodan Pranjic ("Pranjic") and Robert Matos ("Matos") complaints with respect to them.

22    These motions are based on Sphere Drake's contention that regardless of the application of

23    English, Guam or Federal Maritime law the terms and conditions of the underlying insurance

24    policy, the Federal Arbitration Act, and general principles of maritime law, mandate arbitration in

25    London.  For a number of reasons, each separate and independent, this Court finds that Sphere

26    Drake's Motion to Dismiss is well-taken and therefore GRANTS these motions without

27    _____

28         [1]  The Court has reviewed the memoranda of law submitted by Plaintiff Pranjic and Plaintiff Matos, as
      both plaintiffs are represented by the same counsel and the legal arguments are identical this Court has
      consolidated its ruling on these motions to this single order.

RECEIVED
CARLSMITH BALL WICHMAN
CASE & ICHIKI
Date:  10-24-97
Time:  10:17  By:  KS

EXHIBIT _____ 8

1  prejudice.

2  I. BACKGROUND

3      This litigation arises out of two separate incidents of injury (November 25, 1991 - Pranjic)

4  (mid-July 1992 - Matos)occurring aboard the F/V Chloe Z.  As a result of these accidents both

5  Pranjic and Matos suffered physical injury while serving as crewmembers aboard the F/V Chloe Z,

6  a vessel of the Chloe Z Fishing Company ("CZFC").

7      On March 31, 1997, Plaintiffs Pranjic and Matos filed an amended complaint claiming

8  relief under, among other things, a negligence theory.  These complaints include a claim brought

9  against Sphere Drake Underwriting Management, Ltd. ("Sphere Drake") pursuant to Guam's

10  Direct Action Statute - 22 Guam Code Ann. §18305.  Sphere Drake, a British corporation, had

11  provided the CZFC with the P&I coverage for the F/V Chloe Z.

12      Sphere Drake has moved this Court to dismiss Pranjic and Matos' direct causes of action

13  against them based on several independent arguments.  First, based on the express terms of the

14  P&I policy any claim under the policy of insurance must be construed under the laws of England.

15  As such, Pranjic and Matos' claims must be arbitrated, not litigated, pursuant to a contractual

16  arbitration clause and English law.  Second, assuming arguendo, that Guam's Direct Action

17  statute is applicable the arbitration law is still binding on the plaintiffs.  Third, that plaintiff has

18  failed to meet the procedural prerequisites needed to trigger the application of Guam's Direct

19  Action Statute - 22 Guam Code Ann. §18305.  Fourth, the Federal Arbitration Act ("FAA") and

20  the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("Convention")

21  (9 U.S.C. §201-208) mandate dismissal of this claim in favor of arbitration.  And fifth, that

22  general principles of maritime law support dismissal.

23      Pranjic/Matos oppose any dismissal of their claims.  Plaintiffs argue that as non-parties to

24  the P&I policy injured seamen are not bound by either the choice-of-law clause or the arbitration

25  clause of the policy.  In support of this position, plaintiffs argue that this case must be evaluated in

26  light of Guam law, in particular Guam's Direct Action Statute.  As no Guam case law has

27  developed on this matter, Pranjic and Matos contend, under the rationale of Roberto v. Aguon,

28

Page 2

1   that interpretations of Louisiana's Direct Action Statute (LA R.S. 22:655), should be applied.

2   The Louisiana courts, based on public policy grounds, have held that the terms and conditions of

3   insurance contracts which have the effect of defeating the statutory right of direct action are

4   annulled or superseded by LA R.S. 22:655. Accordingly, it is the plaintiffs' position that neither

5   the choice-of-law nor the arbitration clause are binding on injured seamen bringing an action

6   under the procedures of 22 Guam Code Ann. §18305.

7       Upon review of the parties' legal memoranda and the governing law this Court finds that

8   the contractual arbitration clause is binding in this matter. Accordingly, Sphere Drake's Motion

9   to Dismiss is GRANTED.

10   II. ANALYSIS

11       A. Federal Rule of Civil Procedure 12(b) - Motion to Dismiss in Favor of Arbitration

12       It is unclear, based on Sphere Drake's motion, on what section of Federal Rule of Civil

13   Procedure 12(b) they move to dismiss. Nor have federal courts developed a standard analysis of

14   evaluating dismissal based on mandatory arbitration provisions. A review of the case law in this

15   area shows that courts have relied on Rule 12(b)(1) (lack of subject matter jurisdiction), Rule

16   12(b)(3) (improper venue), and Rule 12(b)(6) (failure to state a claim upon which relief can be

17   granted). Nevertheless, this Court has determined that this motion is based on a question of

18   whether this Court has jurisdiction (Rule 12(b)(1)) to hear the case, in light of the arbitration

19   provision. This procedural determination is based on the following analysis: if the arbitration

20   clause is binding on the parties of this action this Court is without jurisdiction to consider the

21   dispute. Accordingly, to the extent that Sphere Drake's motion is based on the arbitration

22   provision of the contract it shall be considered a motion to dismiss under Rule 12(b)(1). See State

23   of N.Y. v. Oneida Indian Nation of New York, 90 F.3d 58 (2nd Cir. 1996) (where claim is subject

24   to mandatory arbitration dismissal is based on lack of jurisdiction).

25       Where a court lacks subject matter jurisdiction over a claim dismissal is appropriate.

26   Fed.R.Civ.P. 12(b)(1). A 12(b)(1) motion to dismiss may attack either the complaint on its face

27   or the existence of subject matter jurisdiction in fact. Thornhill Publ'g v. General Tel. & Elecs.,

28

Page 3

1   594 F.2d 730, 733 (9th Cir. 1979).

2

3       1. Choice of Law

4       The principal issue in this matter is whether the plaintiffs, nonparties to the P&I policy, are

5 bound by the policy's mandatory arbitration clause - Clause 53. If so, this Court lacks jurisdiction

6 over this dispute. However, the parties submit alternative arguments based on application of

7 Federal Maritime, English and Guam law. Sphere Drake argues that the arbitration clause

8 operates to divest this Court of jurisdiction under English or Guam law; moreover, that an

9 emerging federal maritime rule mandates the same. Pranjic and Matos counter that under the

10 holding of <u>Wilburn Boat</u> Guam law must be applied. Therefore, before this Court makes a

11 substantive determination of the issues a threshold determination regarding the choice-of-law

12 question must be made.

13       It is well settled that a marine insurance policy is a maritime contract within federal

14 admiralty jurisdiction. <u>Morrison Grain Co. v. Utica Mut. Ins. Co.</u>, 632 F.2d 424, 428 n. 4 (5th

15 Cir.1980); <u>Irwin v. Eagle Star Ins. Co.</u>, 455 F.2d 827, 829 (5th Cir.1972). Federal courts sitting

16 in admiralty apply federal choice of law rules. <u>See Commercial Union Ins. Co. v. Home</u>, 787

17 F.Supp. 337, 339 (S.D.N.Y. 1992). In <u>Aqua-Marine Constructors, Inc. v. Banks</u>, 110 F.3d 663

18 (9th Cir. 1997) the Ninth Circuit, relying on <u>Albany Insurance Co. v. Anh Thi Kieu</u>, 927 F.2d 882

19 (5th Cir. 1991), set out a three-part choice of law standard to be applied where the laws of more

20 than one jurisdiction vie for application in a maritime contract case.

21       First, the Court must determine whether federal maritime law preempts the matter. <u>Aqua-</u>

22 <u>Marine</u>, 110 F.3d at 673. In determining whether a federal maritime rule controls the issue,

23 courts should examine three factors: (1) whether the federal maritime rule constitutes "entrenched

24 federal precedent," (2) whether the state has a substantial and legitimate interest in the application

25 of its law; and, (3) whether the state's rule is materially different from the federal maritime rule.

26 <u>Albany Insurance</u>, 927 F.2d at 886. Each of these three factors is instructive, but none is

27 dispositive. <u>Id.</u> at 887. In this matter, there is no entrenched federal maritime precedent to guide

28

Page 4

1   this Court, Id. at 888. This Court does recognize, and will address below, the emerging rule of

2   Aasma v. American Steamship Owners Mutual P&I Association, Inc., 95 F.3d 400 (6th Cir. 1996).

3   Aasma, applying Wilburn Boat, crafted a federal maritime rule giving mariners the right of direct

4   action to proceed against a vessel's insurer. Nevertheless, despite this Court's general approval

5   of a uniform federal rule on this issue it cannot be said, at this point, that Aasma is an entrenched

6   federal maritime rule.

7       Second, Aqua-Marine requires that the admiralty court conduct an interstate choice of law

8   analysis using the Restatement (Second) of Conflict of Laws §188. The Restatement approach

9   determines applicable law by identifying "the state which ... has the most significant relationship to

10   the transaction and the parties...." In making this determination, the Restatement[2] counsels

11   consideration of (a) the place of contracting, (b) the place of negotiation of the contract, (c) the

12   place of performance, (d) the location of the subject matter of the contract, and (e) the domicil,

13   residence, nationality, place of incorporation and place of business of the parties. Under the

14   Restatement approach, the foregoing contacts are evaluated according to their relative importance

15   with respect to the issue in question. Applying this approach in this case demonstrates that

16   England, Commonwealth of Northern Marianas ("CNMI", and Guam have some arguable

17   relationship to the matter in dispute.

18       England was the choice-of-law jurisdiction by the contracting parties and the corporate

19   residence of Sphere Drake. Moreover, England was the contracting, negotiation and performance

20

21

22     [2] The Restatement provides:
     In the absence of an effective choice of law by the parties ... the contacts to be taken into account ... to

23   determine the law applicable to an issue include:

24       (a) the place of contracting
      (b) the place of negotiation of the contract

25       (c) the place of performance

26       (d) the location of the subject matter of the contract, and
      (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

27   These contacts are to be evaluated according to their relative importance with respect to the particular issue. ...

28   If the place of negotiating the contract and the place of performance are in the same state, the local law of this
  state will usually be applied. Restatement (Second) of Conflict of Laws §188(2) and (3).

1  location of the insurance policy. See Declaration of Mark Jones attached to Sphere Drake's April

2  2, 1997 Memorandum in Support of Motion to Dismiss Plaintiff Mazic. CNMI is the corporate

3  residence of CZFC. Additionally, the residences of both Pranjic and Matos have an arguable

4  interest in this action. Guam's contacts with regard to the insurance policy are limited. However,

5  Guam did have substantial contact with the CZFC as an operating port for the F/V Chloe Z[3] ( the

6  subject matter of the contract).

7      Third, the Court must determine, among the "eligible states," which jurisdiction has the

8  greatest interest in the dispute. Aqua-Marine, 110 F.3d at 674. In this case, the issue in question

9  is the application of certain terms and conditions of a P&I policy where a seaman brings a direct

10  action against the P&I insurer. Of the eligible states, England (the place of contracting,

11  negotiation and performance) has a considerably greater interest in the application of this

12  insurance policy than does Pranjic/Matos place of residence, Guam or the CNMI. Moreover,

13  under §188 of the Restatement (see Footnote 2) - the choice-of-law clause and the "place of

14  negotiating the contract and the place of performance" - provide a presumption strongly favoring

15  the application of English law. As for Guam, no citizen of Guam is a party to or beneficiary of

16  the contract at issue. Likewise, Guam's interest in enforcing the obligations of Sphere Drake (a

17  foreign corporation) to Pranjic/Matos (foreign citizens) based on an insurance contract with

18  CZFC (a now-defunct CNMI corporation) based on an accident outside Guam's territorial waters

19  is remote. Likewise, CNMI's interest in the resolution of the dispute is also minimal. Finally,

20

21  [3] Plaintiffs argue that there are "substantial contacts with Guam." However, the facts presented in
   support of this argument, apparently made to support the position that Guam's Direct Action Statute should

22  apply to CZFC's insurance policy, are unpersuasive. This argument confuses the minimum contacts
   (International Shoe) analysis necessary to hold a foreign insurer subject to a court's personal jurisdiction with

23  the required contacts needed to trigger a right of direct action under 22 Guam Code Ann. §18305. The
   required analysis is distinct. For instance, the same Louisiana courts upon which plaintiffs rely have held that

24  unless the insurance policy in question was written or delivered in Louisiana, or the accident occurred in
   Louisiana, there is no right of direct action no matter how many other Louisiana statutes the insurer has

25  complied with, or how many other contacts the insurer may have here. Esteve v. Allstate Ins. Co., 351 So.2d

26  117 (La.1977); Easterly v. Dynamic Enterprises, Inc., 334 So.2d 467 (La. 1st Cir. 1976); Cambre v. St. Paul
   Fire & Marine Ins. Co., 331 So.2d 585, 588-589 (La. 1st Cir. 1976); Kirchman v. Mikula, 258 So.2d 701, 703

27  (La. 3d Cir. 1972). Quite simply, while this Court may, based on the analysis presented by plaintiffs, have
   personal jurisdiction over CZFC the minimum or substantial contacts analysis presented is neither the

28  triggering feature of Guam's Direct Action Statute nor is it particularly relevant under Aqua-Marine.

Page 6

1   although their places of residence might have a substantial interest in applying their law neither

2   Pranjic nor Matos have argued that the law of their home of residence should apply. England is

3   the jurisdiction with the greatest interest in the resolution of this direct action. Therefore, under

4   Aqua-Marine[4] this Court finds English law must be applied to this dispute.

5      Despite this finding, this Court has elected to review this matter, in the alternative, under

6   British, Guam and federal maritime law. As set forth below it is this Court's conclusion that

7   under any of the three principal options the result is the same: Pranjic and Matos are bound by the

8   terms and conditions of the insurance policy, including the arbitration provision.

9      a. English Law

10      English law provides a right of direct action for third parties against insurance companies.

11   Aasma, 95 F.3d at 405 (relying on interpretations of England's Third Party Act of 1930), citing,

12   Firma C-Trade SA v. Newcastle Protection and Indemnity Association (The Fanti); Socony

13   Mobile Oil Co., Inc. v. West of England Shipowners Mutual Insurance Association (London)

14   LTD (The Padre Island), 2 All E.R. 705 (1990). However, in a direct action the British Courts

15   have held that the third party plaintiff is not placed "in any better position as against the insurer

16   than that of the insured himself.'" Id. British law binds third-party plaintiffs to the terms and

17   conditions of the underlying policy. Accordingly, plaintiffs are bound by the arbitration clause

18   (Clause 53) and Sphere Drake is entitled to dismissal. Aasma, 95 F.3d at 405 (holding, under

19   British law, that both third party and P&I Club are bound by insurance policy arbitration clause).

20      b. Guam Law

21      Pranjic and Matos contend that, contrary to Clause 60, Guam law must be applied in this

22   case. Pursuant to Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 321 (1955), the

23   plaintiffs argue that marine insurance issues are generally governed by state law. Accordingly,

24

25      [4] As further discussed below, injured parties filing actions under the Guam's Direct Action Statute

26   (§18305) must conform with the terms and conditions of the policy. Capital Insurance & Surety Co., Inc. v. Globe Indemnity, 382 F.2d 623, 626 n.3 (9th Cir. 1967). Therefore, independent of this Court's conflict of laws

27   analysis plaintiffs must comply with Clause 60 of the underlying policy which provides in part that the policy "shall be governed by, and construed in accordance with English law." See Sphere Drake Marine Insurance

28   Policy.

Page 7

1  this matter which involves issues of marine insurance must be analyzed under Guam law. Despite

2  this Court's determination that English law must be applied to a dispute under this policy the

3  Court will analyze this issue under Guam[5] law, in the alternative.

4      Pranjic and Matos base their complaint against Sphere Drake on the direct action

5  procedure set forth in 22 Guam Code Ann. §18305 (Liability Policy; Direct Action) which states:

---

[5] Much is made of the applicability of Louisiana case law to this case. Nevertheless, based on two separate and independent rationales, Louisiana case law has no binding, and little persuasive, effect on the application of 22 Guam Code Ann. §18305:

(1) Plaintiffs offer no concrete evidence that Guam's Direct Action statute was adopted in whole or in part from Louisiana. The sole authority presented for this position is dicta from a 1965 case of this Court. Pranjic/Matos Opposition Memoranda at p. 3, citing, Kelly v. Capital Insurance & Surety Company, 241 F.Supp. 605 (D.Guam 1965). A full reading of the Kelly case demonstrates that Judge Shriver merely recited Capital Insurance & Surety's unsupported position that Guam's Direct Action statute was adopted from Louisiana. No citation to legislative materials or history was provided. Moreover, plaintiffs have failed to present any direct, independent evidence of this alleged statutory adoption. As such, this Court declines to blindly follow this unsupported position.

(2) Assuming arguendo, that Guam's Direct Action Statute originated from LA R.S. 22:655, the numerous legislative and judicial modifications to Louisiana's statute has undergone since 1959 render any modern comparison meaningless. Pranjic and Matos' argument that Louisiana case law should be given persuasive effect is based on his contention that the Fourth Guam Legislature adopted Guam's Direct Action Statute from Louisiana. This position is apparently based on the theory of statutory construction that when one jurisdiction adopts the statute of another jurisdiction as its own, there is a presumption that the construction placed upon the borrowed statute in the original jurisdiction is transferred to the adopting jurisdiction. Vela v. Government Employees Insurance Company, 395 F.2d 437, 439 (9th Cir. 1968), see also Roberto v. Aguon, 519 F.2d 754 (9th Cir. 1975) (decisions of courts from originating jurisdiction which pre-date adoption of statute by Guam are controlling authority; decisions of courts from originating jurisdiction which post-date adoption of statute by Guam are persuasive, but not binding authority); People v. Agualo, 948 F.2d 1116, (9th Cir. 1991) (where Guam statute remains identical to statute of jurisdiction from which the statute was patterned that jurisdiction's judicial construction of the statute is persuasive). However, this position ignores the reality that since 1959 Louisiana's Direct Action Statute has been modified and amended on several occasions, including a major revision in 1962. See generally LA R.S. 22:655 Historical and Statutory Notes. These extensive modifications compared to the fact that Guam's Direct Action Statute has remained unchanged for almost 40 years renders the reasoning of Aguon, and its rule of construction, inapplicable in this case. See generally Norman J. Singer, 2B Sutherland Statutory Construction ("Sutherland Statutory Construction") §52.02 (where there is a change in a statute's construction subsequent to its adoption by another jurisdiction the reasoning behind the general rule of analogy fails). Any similarities in text or policy that these two statutes may have had in 1959 no longer exist. Accordingly, any arguable persuasive effect Louisiana precedent has in this jurisdiction is negligible. This Court will not grant either the Louisiana or Fifth Circuit cases relied upon by plaintiffs any special significance. See generally People v. Wakugawa, District Court of Guam, Appellate Division CR 96-00052A, Opinion filed July 3, 1997 (where California statute had undergone substantial amendments since Guam's 1956 adoption the Appeal to Division held that California cases interpreting the California counterpart were of little persuasive value).

Page 8

1　On any policy of liability insurance the injured person or his heirs or
2　representatives shall have a right of direct action against the insurer within the
　　terms and limits of the policy, whether or not the policy of insurance sued upon
3　was written or delivered in Guam, and whether or not such policy contains a
　　provision forbidding such direct action, provided that the cause of action arose in
4　Guam. Such action may be brought against the insurer alone, or against both the
　　insured and insurer.

5　Direct action statutes serve the general purpose of permitting an injured person to sue the liability

6　insurance carrier directly; thereby, protecting the public at large by providing a procedure for

7　remuneration from the financially responsible entity. <u>Capital Ins. & Sur. Co. v. Globe Indem. Co.</u>,

8　382 F.2d 623 (9th Cir. 1967). Accordingly, Pranjic and Matos have elected to sue Sphere Drake,

9　as CZFC's P&I insurer, directly.

10　　The question this action now presents is whether the plaintiffs are bound by the terms and

11　conditions (Clause 60 Choice-of-Law and Clause 53 Arbitration) of the underlying policy. The

12　plain language of the direct action statute answers this question. The express language of §18305

13　limits the "right of direct action against the insurer <u>within the terms and limits of the policy</u>." 22

14　Guam Code Ann. §18305 (emphasis added). This construction of §18305 is not one of first

15　impression, the Ninth Circuit has indirectly addressed this issue in two cases. First, in <u>Capital</u>

16　<u>Insurance & Surety Co. Inc. v. Kelly</u>, 361 F.2d 567 (9th Cir. 1966), the Ninth Circuit declined to

17　expand Guam's Direct Action Statute, based on public policy considerations, where such an intent

18　was not expressed by the Guam legislature. This decision was grounded on the <u>Kelly</u> Court's

19　determination that Guam's legislature had expressly limited the right of direct action to actions

20　"within the terms and limits of the policy." <u>Kelly</u>, 361 F.2d at 569. The next year, in <u>Capital</u>

21　<u>Insurance & Surety Co., Inc. v. Globe Indemnity</u>, 382 F.2d 623 (9th Cir. 1967), the Ninth Circuit

22　noted that regardless of the "public policy of Guam" the Direct Action Statute expressly limits

23　direct actions "within the terms and limits of the policy." <u>Globe Indemnity</u>, 382 F.2d at 626 n.3,

24　<u>citing</u>, <u>Kelly</u>, 361 F.2d at 569. Accordingly, under 22 Guam Code Ann. §18305, an injured party

25　is subject to the terms and conditions of the insurance policy - including choice-of-law and

26　arbitration provisions.

27　　This result is also indirectly supported by case law which holds that non-parties to a

28

Page 9

1  contract containing an arbitration clause may be bound by that clause. Wells Fargo Bank

2  International Corporation v. London Steam-Ship Owners' Mutual Insurance Association, LTD.,

3  408 F.Supp. 626, 629 (S.D.N.Y. 1976) (holding that non-party ship mortgagee (Wells Fargo) was

4  bound by arbitration clause entered into between P&I Club (London Steam-Ship) and defunct

5  vessel owners); Florio v. General Acc. Fire & Life Assur. Corp., 396 F.2d 510 (2nd Cir. 1968)

6  (claimant authorized by New York Direct Action Statute to bring suit directly against insurer

7  stands in the shoes of the insured and must abide by any applicable provisions of the policy).

8       This Court acknowledges plaintiffs' citation to Louisiana cases which hold the contrary.

9  Louisiana courts have, based on "public policy," held that terms and conditions in an insurance

10  policy which have the effect of defeating a direct action are annulled and superseded by the

11  Louisiana's Direct Action Statute. Zimmerman v. International Companies & Consulting, Inc.,

12  107 F.3d 344, 346 (5th Cir. 1997); In the Matter of Talbott Big Foot, Inc., 887 F.2d 611, 613 (5th

13  Cir. 1989). These cases are based on an entirely different statute in a minority jurisdiction;

14  therefore, they have limited influence on this Court's interpretation of Guam's Direct Action

15  Statute. See Footnote 5; see generally Norman Ronneberg, An Introduction to the Protection &

16  Indemnity Clubs and the Marine Insurance They Provide, 3 U.S.F.Mar.L.J. 1, 31-32 (1990)

17  (stating that in most jurisdictions third-parties have no direct rights against P&I Clubs; Louisiana

18  stands in the minority allowing such direct actions). Additionally, the Louisiana cases run directly

19  counter to the Ninth Circuit's rulings indicating a reluctance to use "policy" to allow a direct

20  action party to avoid the terms and conditions of the underlying insurance contract. Globe

21  Indemnity, 382 F.2d at 626 n.3; Kelly, 361 F.2d at 569.

22       Accordingly, even under Guam law Sphere Drake is entitled to dismissal.

23            c. Federal Maritime Law

24       The Sixth Circuit in Aasma v. American Steamship Owners Mutual P&I Association, Inc.

25  laid the foundation for the formation of a uniform federal rule on this maritime insurance issue.

26  Aasma v. American Steamship Owners Mutual P&I Association, Inc., 95 F.3d 400 (6th Cir. 1996).

27  In Aasma, the Sixth Circuit (Chief Judge Merritt), applied Wilburn Boat Company v. Fireman's

28

Page 10

1   Fund Insurance Company, 348 U.S. 310 (1955) to develop a uniform federal admiralty rule to

2   guide courts in evaluating mariners direct actions against a vessel's insurers.  See also Wright,

3   Miller & Kane, Federal Practice and Procedure: Civil 2d §3672 n.27.5 and §3675 n. 14.; John

4   Schmertz and Mike Meier, Choice of Law, 2 International Law Update 141, December 1996

5   (discussing Aasma Court's fashioning of a uniform federal maritime rule to allow injured sailors

6   the right of direct action against employer's insurer).  Presented with a situation where an injured

7   mariner was proceeding directly against a protection and indemnity association it was determined

8   that such a circumstance was "[u]niquely maritime in nature and demands a uniform rule in

9   admiralty."  Aasma, 95 F.3d at 404.  The Aasma rule is clear and straightforward - an injured

10  seaman has a federal right of direct action against a former employer's insurer, subject to, the

11  terms and conditions of the underlying policy.  The seaman "stands in the shoes" of the employer

12  as a beneficiary of the insurance contract.  While the Aasma case is not yet widely recognized this

13  Court concurs with both its analysis and result.  Three principal factors are critical to this

14  determination.

15          First is the need for uniformity in maritime matters.  While this Court recognizes the

16  general rule that state law applies to regulation of marine insurance, this rule is not absolute.

17  Ahmed v. American S.S. Mutual Protection & Indemnity Ass'n, 640 F.2d 993, 996 (9th Cir.1981)

18  (in the absence of a federal admiralty rule, state law applies to the regulation of marine insurance).

19  The United States remains a maritime nation; accordingly, there remains a strong need, due to the

20  international, commercial trade and interstate nature of maritime commerce, for uniformity of

21  maritime law throughout the United States.  Aasma, 95 F.3d at 404; see also Kossick v. United

22  Fruit Co., 365 U.S. 731, 741 (1961).  Our nation's standing among the merchant nations of the

23  world is not advanced by a hodge-podge of different direct action rules against Maritime P&I

24  Associations.

25          Second, these types of direct action cases inevitably involve injured seamen.  As a "ward

26  of admiralty" the merchant seaman has traditionally been afforded special federal protection.

27  Aasma, 95 F.3d at 404, citing, Garrett v. Moore-McCormack Co., 317 U.S. 239, 247-48 (1942).

28

Page 11

1    The formation of a uniform, federal maritime approach to a seaman's right to direct action against

2    P&I Clubs would, ultimately, advance this protection.

3        Third, the unique nature of P&I coverage suggests that admiralty law should depart from

4    the general rule of Wilburn Boat. As Chief Judge Merritt explained:

5        Associations are entities peculiar to the maritime setting. "A protection and
         indemnity association is not a traditional insurance company; it is a group of
6        shipowners who have agreed to insure one another's vessels for the mutual benefit
         of all." Psarianos v. Standard Marine, Ltd., Inc., 728 F.Supp. 438, 451 (E.D.Texas
7        1989). The associations function in a non-profit manner. They do not pay
         "premiums" in the way that insureds pay premiums to their insurance carrier.
8        Rather than pay premiums, the members of associations pay "advance calls" to
         cover claims for the year; when claims exceed funds available, members must pay
9        "supplementary calls" to make up the shortfall. See Norman J. Ronneberg, Jr., An
         Introduction to the Protection & Indemnity Clubs and the Marine Insurance They
10       Provide, 3 U.S.F. Mar. L.J. 1, 10 (1990/1991). Shippers band together in these
         associations because the unusual risks of the world-wide shipping industry render
11       private insurance largely unavailable. Aasma, 95 F.3d at 404.

12   For these reasons, the Aasma Court held, and this Court agrees, maritime protection and

13   indemnity policies to be distinguishable from the standard insurance policy issues of the Wilburn

14   Boat line of cases. Whereas the dispute in Wilburn Boat was a standard insurance matter, similar

15   to common land related insurance issues, conflicts between seamen and P&I Associations are

16   uniquely maritime in nature, and therefore, demand a uniform admiralty rule.

17       Applying the Aasma Rule to this case provides Pranjic and Matos the opportunity to bring

18   a direct action against Sphere Drake. Nevertheless, under Aasma a seaman's federal right of

19   direct action is not absolute. The clear provisions of the underlying insurance contract must,

20   absent compelling facts, be enforced. Thus, in this case, plaintiffs are bound by the choice of law

21   and the arbitration clause.

22       In sum, Aasma and the federal maritime law support dismissal of Pranjic/Matos' direct

23   actions against Sphere Drake, in favor of arbitration. Under Aasma, these direct claims against

24   Sphere Drake are governed by the terms of the policy and must be referred to an arbitrator in

25   England (Clause 53) and decided under British law (Clause 60).

26       2. Federal Arbitration Act

27       The Federal Arbitration Act ("FAA") "provides that written agreements to arbitrate

28

                                   Page 12

1   controversies arising out of an existing contract 'shall be valid, irrevocable, and enforceable, save

2   upon such grounds as exist at law or in equity for revocation of any contract.' " Aasma, 95 F.3d at

3   405, citing, Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213 (1985), quoting, 9 U.S.C. §2.

4   Furthermore, the Convention on the Recognition and Enforcement of Foreign Arbitral Awards

5   (the "Convention") (9 U.S.C. §§201-208) an international Convention and an amendment to the

6   Federal Arbitration Act, requires enforcement of arbitration clauses in international contracts

7   unless the clause is null and void. Therefore, where an international contract includes an

8   arbitration clause it shall be enforced absent a legal or equitable ground for revocation.

9       In this case, the Sphere Drake's marine P&I policy is a maritime commercial contract

10   which is subject to the FAA and the Convention. See 9 U.S.C. §2 and §202. As well, this Court

11   has found (under English, Guam or general federal maritime law) that although injured mariners

12   have a right of direct action they "stand the shoes" of the insured who are bound by the terms

13   and conditions of the insurance policy. Therefore, there is no legal or equitable reason to revoke

14   or void these clauses.

15      In opposition, plaintiffs present a well-supported argument[6] that as third-parties to the

16   contract he is not, under the Federal Arbitration Act or the Convention, bound by the arbitration

17   clause. See Zimmerman, 107 F.3d at 346 (holding in a maritime direct action case based on

18   Louisiana's Direct Action Statute that a third party is not bound by FAA as he never "agreed to

19   refer [dispute] to arbitration"); Morewitz v. West England Ship Owners Mutual Protection and

20   Indemnity Association, 62 F.3d 1356, 1365 (11th Cir. 1995) (holding in a maritime direct action

21   case based on Louisiana's Direct Action Statute that a third party is not bound by FAA as he

22   never "agreed to refer [dispute] to arbitration"). However, this argument is unpersuasive for this

23   Court has found, contrary to cases such as Zimmerman and Morewitz, that the arbitration term in

24

25      [6] Assuming arguendo that the Federal Arbitration Act does not "mandate" arbitration in this matter
    such a finding is not fatal to this Court's decision. This Court's decision to dismiss Sphere Drake is based on
26   the requirement of arbitration found in Clause 33 as interpreted to apply to plaintiffs under English, Guam and
    federal maritime law (Aasma). Nevertheless, the FAA is, at a minimum, supportive of the Court's
27   determination to require arbitration. Aasma, 95 F.3d at 405. "Enforcing the arbitration clause in this case
    follows the strong policy of federal law favoring arbitration." Aasma, 95 F.3d at 405, citing, Moses H. Cone
28   Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 24 (1983).

Page 13

1   the insurance contract is a lawful, binding condition on any party proceeding pursuant to Guam's

2   Direct Action Statute. See Pages 7-10, above. It has been determined that injured seamen stand

3   in the shoes of CZFC, the contracting party, and under English, Guam or federal maritime law is

4   bound by the terms and conditions of the insurance contract. Although plaintiffs were not actual

5   parties to the insurance contract between Sphere Drake and CZFC, if they want to try to enforce

6   it, they are subject to its terms and to the law governing its terms. Aasma, 95 F.3d at 405. In a

7   dispute with the insurer, therefore, the direct action seaman is no less bound by the arbitration

8   clause than the insured would have been.

9       For the reasons set out above, it is ordered that both Pranjic and Matos' direct actions

10   against Sphere Drake are DISMISSED without prejudice. Offshore Sportswear, Inc. v. Vuarnet

11   Intern. B.V., 114 F.3d 848 (9ᵗʰ Cir. 1997).

12       IT IS SO ORDERED.

13     Dated: October 23ʳᵈ 1997

14

15                  JOHN S. UNPINGCO

16                  District Judge

17

18

19

20

21

22

23

24

25

26

27

28

Page 14

Michael A. Barcott
HOLMES WEDDLE & BARCOTT
999 Third Avenue, Suite 2600
Seattle, Washington 98104
(206) 292-8008 Telephone
(206) 340-0289 Facsimile

Anita P. Arriola
ARRIOLA, COWAN & ARRIOLA
259 Martyr Street, Suite 201
Hagatna, GU 96932
(671) 477-9734 Telephone
(671) 477-9703 Facsimile

Attorneys for the M/V CHLOE Z

## IN THE UNITED STATES DISTRICT COURT

## FOR THE TERRITORY OF GUAM

| | |
|---|---|
| TCW SPECIAL CREDITS, et al., | |
| Plaintiffs, | Case No. 96-00055 |
| v. | DECLARATION OF DAVID FREDERICK |
| FISHING VESSEL M/V CHLOE Z, et al., | |
| Defendants. | |

I, David Frederick, declare as follows:

1.    I am over the age of 18, am competent to be a witness and make the following declaration based on my personal knowledge.

2.    I am a 1989 graduate of the University of Texas Law School. Subsequent to my graduation from the University of Texas, I served as a judicial law clerk for Judge Joseph Sneed of the United States Court of Appeals for the Ninth Circuit and then for United States Supreme Court Justice Byron White. I then served as an assistant to the Solicitor General at the United States Department of Justice for 5 years. While working

DECLARATION OF DAVID FREDERICK - 1

EXHIBIT _____ **9**

at the Solicitor General's office, I argued 12 cases before the United States Supreme Court and, since that time, have argued an additional 7 cases before that Court. My practice focuses heavily upon appellate advocacy, including a significant practice before the United States Supreme Court. I have authored several books including <u>Supreme Court And Appellate Advocacy</u> (West, 2003) and the <u>The Art of Oral Advocacy</u> (West, 2003).

3.     Based upon my experience and practice, I am personally familiar with the internal scheduling of matters that come before the Supreme Court.

4.     I have been retained as Supreme Court Counsel in this matter. Our petition for writ of certiorari was filed with the Supreme Court on December 28, 2006. It was docketed with that Court on January 4, 2007. Under the current schedule a response brief is due on February 5, 2007. The judicial conference in which this matter is considered will occur on March 16, 2007, and an order regarding this petition would be anticipated on March 19, 2007.

5.     It is often the case that the respondents seek an extension of time and 30 day extensions are routinely granted. Should respondents request such an extension of time, their response brief will be due on March 5, 2007, the Court conference will occur on April 13, 2007, and the Court's order would be anticipated on April 16, 2007.

I declare under penalty of perjury under the laws of the District of Columbia that the foregoing is true and correct.

DATED at Washington, D.C., this 12ᵗʰ day of January , 2007.

David Frederick

G:\2446\13835\PLDG\FREDERICK DECL 1.10.07.DOC

DECLARATION OF DAVID FREDERICK - 2




```
TCW SPECIAL CREDITS, a California          )
general partnership, as Agent              )
and Nominee,                               )
                    Plaintiff,             )
     vs.                                   )    Case No.  96-00055
                                           )
FISHING VESSEL M/V CHLOE Z,                )
Official No. 653391, her engines,         )
nets, furniture, etc., In Rem;            )
CHLOE Z FISHING COMPANY, INC.,            )
a Commonwealth of the Northern            )
Mariana Islands corporation,              )    DEPOSITION OF
In Personam,                              )    DWIGHT RITTER, ESQ.
                                           )
                    Defendants.            )    SAN DIEGO,
                                           )    CALIFORNIA
_____        )
                                           )
ROBERT MATOS,                              )    MARCH 21, 2001
                                           )
        Plaintiff-in-Intervention,         )
                                           )
     vs.                                   )
                                           )
M/V CHLOE Z, her engine, tackle,           )
apparel and furniture, CHLOE Z             )
FISHING COMPANY, INC., a                   )
corporation, TUNA CLIPPER                  )
SERVICES, ZEE ENTERPRISES, INC.,           )
a corporation; and DOES I                  )
through X, inclusive,                      )
                                           )
        Defendants.                        )
_____        )
```



**B·A·R·R·O·N**

**B·A·R·B·E·R**

COURT

REPORTING

SERVICE

CYNTHIA A. JACKSON
CSR NO. 5168

1551 FOURTH AVENUE • SUITE 801 • SAN DIEGO, CA 92101 • (619) 544-8020

SLOBODAN PRANJIC,

      Plaintiff-in-Intervention,

    vs.

M/V CHLOE Z, Official No. 653391,
her engines, equipment, tackle,
appurtenances, apparel, furniture,
and fish catch, In Rem, CHLOE Z
FISHING COMPANY, INC., a
Commonwealth of the Northern
Mariana Islands Corporation, In
Personam, and DOES 1 through 50,

      Defendants.

1    Q.   Do you consider yourself knowledgeable in the

2    field of maritime insurance?

3    A.   I would say generally, yes.

4    Q.   Then with regard to maritime work and your

5    knowledge, could you explain to me what a limitation of

6    liability action is?

7    A.   No.   That -- that's too vague a term.   I don't

8    know what you mean by that.   I mean, I guess I could

9    research that item, get an answer, but I don't -- I

10   don't know what you mean by "limitation of liability."

11   That has a lot of different meanings in law.

12   Q.   There is an act called the Limitation of

13   Liability Act.   Would you please tell me what that act

14   does.

15   A.   I am not sure without reviewing that act and

16   looking at that act exactly what it does.

17   Q.   Have you ever heard of that act before?

18   A.   I have heard of it.   I have heard of it.   Not

19   sure that I've had a case that focused on Limitation of

20   Liability Act.

21   Q.   In what context, if you know, is the Limitation

22   of Liability Act invoked?

23   MR. DOUGHERTY:   Well, I'm going to object to

24   the question as being irrelevant in that the present

25   case did not involve a sinking of a vessel, so

12

1    Limitation of Liability Act would not have applied.

2          I'm not sure where you're going with this.

3    He's indicated that he's knowledgeable but not an

4    expert.  Given that previous answer, I believe this

5    question is irrelevant.

6          You may still answer if you have a response.

7       A.  No, I really don't -- I guess I don't know

8    where you're going or what your question is with regards

9    to Limitation of Liability Act.

10   BY MR. BARCOTT:

11      Q.  You're familiar with the Jones Act?

12      A.  I am familiar with the Jones Act.

13      Q.  What's the statutory citation to the Jones Act?

14      A.  I don't know that.  I'd have to look it up.  I

15   don't know the statutory citations.

16      Q.  The Jones Act incorporates by reference what

17   body of law?

18          MR. DOUGHERTY:  Again, the same objection.

19   Irrelevant.

20      A.  Glad this wasn't on the bar exam, I guess,

21   because I'm not real sure what the answer to that

22   question -- I guess I don't understand your question

23   enough to give you an answer.

24   BY MR. BARCOTT:

25      Q.  I'll make the question very explicit.  The